**Patricia DEMAREST and Vicki Dunn, Plaintiffs,**

v.

**ATHOL/ORANGE COMMUNITY TELEVISION, INC., et. al., Defendants.**

No. Civ.A.01–30129–MAP.

United States District Court, D. Massachusetts.

Feb. 28, 2002.

Harris Freeman, William Newman, American Civil Liberties Union of Massachusetts, Northampton, MA, for plaintiffs.

Peter J. Epstein, Boston, MA, for defendants.

## MEMORANDUM REGARDING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION (Docket No. 2)

PONSOR, District Judge.

### I. INTRODUCTION

The plaintiffs Patricia Demarest ("Demarest") and Vicki Dunn ("Dunn") (together, "plaintiffs") produced a show called "Think Tank 2000," which aired on a local public access cable television station, Athol

Orange Television, Inc.[1] Think Tank 2000 concerned itself with issues of local concern, and some of its broadcasts focused on the behavior of local officials in Athol, Massachusetts. In particular, Demarest criticized one local official as having a conflict of interest, and camped outside another local official's home, broadcasting a segment in which she accused him of using his position to get special treatment. When these officials complained to defendants, AOTV suspended Demarest for thirty days from using AOTV facilities and revised its Policies and Procedures Manual.

The suspension and the revised AOTV Policies and Procedures Manual (the "Revised Manual") brought plaintiffs to this court, seeking injunctive and declaratory relief. Plaintiffs contend that suspending Demarest violated the First Amendment, 42 U.S.C. § 1983, and § 531 of 47 U.S.C. §§ 522 *et seq.* (the "Cable Act"), and that certain provisions of the Revised Manual are in violation of the First Amendment or the Cable Act. Plaintiffs also argue that AOTV has violated Article 16 of the Massachusetts Declaration of Rights. They have filed a motion seeking preliminary injunctive relief.

For the reasons set forth below, plaintiffs' motion for a preliminary injunction will be allowed as to three of the four disputed provisions: (1) the provision that requires release forms from all people that appear in AOTV broadcasts, (2) the provision that prohibits the recording of any illegal act, and (3) the provision that requires producers to indemnify AOTV for legal fees. The motion will be denied as to the provision that requires producers to notify AOTV when a broadcast contains material that is "potentially offensive." Plaintiffs' request that AOTV be enjoined from using Demarest's thirty-day suspen-

sion as grounds for further discipline or curtailment of her use of AOTV equipment or facilities will be allowed.

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. PEG Channels

As noted above, AOTV is a municipally authorized and operated public, educational, and governmental ("PEG") access channel pursuant to § 531 of the Cable Act. (Docket 1, Exhibit A at 23). The history and purposes of PEG channels are now well-established. Justice Breyer described them as "channels that, over the years, local governments have required cable systems operators to set aside for public, educational, or governmental purposes." *Denver Area Educational Telecommunications Consortium, Inc., et al. v. FCC,* 518 U.S. 727, 734, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (plurality opinion).

Historically, cable operators have not exercised editorial control over these channels. *Id.* at 761, 116 S.Ct. 2374. The general intent that operators refrain from editorial control was codified in 1984 with the Cable Act. A House Report accompanying the Act stated that "it is integral to the concept of PEG channels that such use be free from any editorial control or supervision by the cable operator." H.R.Rep. No. 98–934, at 47 (1984), reprinted in 1984 U.S.C.C.A.N. at 4684. The Report explained that,

> Public access channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet. They provide groups and individuals who generally have not had access to the electronic media with the opportu-

---

1. This memorandum will refer to Athol Orange Television, Inc. and the individual de-

fendants collectively as "AOTV" or "defendants."

nity to become sources of information in the electronic marketplace of ideas.

*Id.* at 30, 4667. Thus, § 531(e) provided that "a cable operator shall not exercise any editorial control over any public educational, or governmental use of channel capacity. . . ."

Despite this, PEG programs were not entirely without editorial control. The § 531(e) prohibition on editorial control was balanced by § 544(d)(1), which stated that,

> Nothing in this subchapter shall be construed as prohibiting a franchising authority and a cable operator from specifying . . . that certain cable services shall not be provided or shall be provided subject to conditions, if such cable services are obscene or are otherwise unprotected by the Constitution of the United States.

No other editorial control was permitted. In fact, although the 1992 Cable Act sought to add a provision to restrict indecent programming, it was struck down as violating the First Amendment. *See Denver Area,* 518 U.S. at 760, 116 S.Ct. 2374.

### B. *Background*

As noted, plaintiffs produced a show that aired on AOTV called "Think Tank 2000." Two incidents related to Think Tank 2000 have sparked the current dispute.[2] First, during a Think Tank broadcast on June 27, 2000, Demarest criticized Mary Foristall ("Foristall"), a member of both the AOTV Board of Directors ("the Board") and the Athol Board of Selectmen, of having a conflict of interest because she had served on too many local boards. (Docket 1 at 6). In response, Foristall registered a written complaint with AOTV criticizing the content of this Think Tank broadcast. A hearing before the Board was scheduled for July 19, 2000. *Id.*

Second, on July 4, 2000, Demarest aired a Think Tank program criticizing the special treatment that was allegedly received by Duane Chiasson ("Chiasson"), a member of Athol's Needs Assessment Committee. According to the broadcast, Chiasson was granted a permit to construct a home without filing the proper paperwork. Chiasson allegedly misused that permit to remove large quantities of dirt from his property, an action that, Demarest suggested, should have required a different permit. Demarest contrasted this with the inability of a local resident, Margaret Britt ("Britt"), to get a permit to remove dirt from her home. (Docket 1 at 6–7).[3]

In preparing her broadcast, Demarest set up a camera on the sidewalk opposite Chiasson's home. Chiasson saw Demarest filming, and stopped his car in the street. The two then had a "lengthy conversation." (Docket 1 at 7). Part of this conversation, along with Demarest's questions and commentary, was broadcast as part of the July 4, 2000 Think Tank report which aired on July 6, 2000. *Id.*

---

**2.** Exhibit A to Docket 3 points to a potential third incident. It contains a letter from Marshall Tatro ("Tatro"), the AOTV president, to Pamela Mendoza ("Mendoza") and Candance Whillhite ("Whillhite"), who are apparently public officials affiliated with the Athol finance committee and the Athol Teen Task Force, respectively. In this letter, Tatro apparently is responding to a May 8, 2000 note of complaint from Mendoza and Whillhite about Think Tank 2000. However, this letter is the only reference in the record to this complaint or incident. As such, it has played no part in this decision.

**3.** It should be noted that in summarizing these facts the court is not in any way suggesting that the criticism of Ms. Foristall or Mr. Chiasson was, or was not, fair or reasonable. The accuracy of the criticisms is irrelevant to the issues addressed in this memorandum.

On July 6, Chiasson complained to AOTV that Demarest did not get his permission to tape the conversation, and that "she does not get her facts straight." *Id.* at 8. He asked that something be "done about this." *Id.* On July 9, 2000, AOTV responded by refusing to air the Chiasson broadcast during the three additional slots scheduled for Think Tank 2000. *Id.* On July 10, 2000, Carol Courville ("Courville"), a member of the Board, suspended Demarest from all AOTV rights and privileges. The suspension letter stated that,

> The videotape Think Tank 2000 # 16, which premiered on July 6, 2000 at 5:00 p.m. has violated AOTV's policy XII.b.3. of "knowingly falsifying forms." On the tape, both Mr. Chiasson and Mrs. Britt made it clear that they did not want to be on camera and you continued to videotape and cablecast the program. On the "Air Time Request Form" signed by you on July 6, it states that you have "obtained all necessary releases . . . from individual(s)."
>
> Therefore, as Executive Director, you leave me no choice but to take this necessary action.

(Docket 1, Exhibit C) (the "Suspension Letter"). The Suspension Letter informed Demarest that the length of her suspension would be determined at a hearing during the July 19, 2000 AOTV board meeting. *Id.*

During the July 19, 2000 hearing, the Board accused Demarest of (1) violating AOTV laws by not getting Chiasson's permission to record the conversation; (2) violating Massachusetts criminal law for the same; and (3) "lying" when she completed the AOTV form indicating that she had received all necessary release forms. The Board suspended Demarest for thirty days from using AOTV facilities. (Docket 1 at 8–9).

On March 21, 2001, the Board revised several of its policies and procedures and adopted the "Revised Manual." To understand these revisions, some context is necessary. AOTV is governed by a franchise agreement with the town of Athol, most recently renewed on August 23, 1996. (Docket 1, Exhibit A). The franchise agreement created AOTV and an "Access Group," which was responsible for managing and operating AOTV. *Id.* at 25. The agreement invested the Access Group with the authority to establish written rules and procedures necessary to ensure access to equipment and time on the channel to "all interested residents, organizations or institutions in the town on a non-discriminatory, first-come, first-served basis." *Id.*

The inclusiveness required by the franchise agreement was reflected in the introduction to the AOTV Manual. Both the Revised Manual and its predecessor stated that "there is very little limit to what you can produce and show on access television. The equipment and air time is here for you and everyone." (Docket 1, Exhibit B at 2, Exhibit D at 2).

The AOTV Policies and Procedures Manual that was in effect until March 21, 2001 (the "2000 Manual"), docket 1, exhibit B, was markedly different from the Revised Manual. Four changes, in particular, are relevant to plaintiffs' motion for preliminary injunction.

First, the 2000 Manual contained a provision exempting certain producers from a requirement that a release form be obtained from any person appearing in an AOTV broadcast. The exemption covered persons whose images or voices were recorded during "electronic news-gathering" ("ENG"). *See* Docket 1, Exhibit B at 15 ("release forms for persons recorded during ENG are not required.").

The Revised Manual eliminated this exemption. That elimination, and the result-

ing policy, was the basis for plaintiffs' first challenge. Section XI.a of the Revised Manual required producers to submit "[r]elease forms for persons appearing visually or by voice in programs . . . before air time will be scheduled." No exception was made for "persons recorded during ENG." (Docket 1, Exhibit D at 16). This provision of the Revised Manual will be referred to as the "Release Form Provision."

Second, the 2000 Manual provided that: "[t]he recording of an illegal act is not recommended as it may lead to harm to the equipment or people involved with its use." (Docket 1, Exhibit B at 12). Thus, as of the year 2000, the Manual merely discouraged recording an illegal act, but supplemented that discouragement with a warning that producers were responsible for borrowed equipment. "Should [the equipment] be stolen, damaged, or lost [the producer] must pay for its repair or replacement." (Docket 1, Exhibit B at 12; Exhibit D at 12) (the "Damaged Equipment Provision").

The Revised 2001 Manual was more restrictive. It retained the Damaged Equipment Provision, and provided that "[t]he recording of an illegal act is not permitted as it may lead to harm to the equipment or people involved with its use." (Docket 1, Exhibit D at 12). Thus, the new provision forbade, rather than merely discouraged, the recording of illegal acts. Plaintiffs' second challenge is to this provision, which will be referred to as the "Illegal Act Provision."[4]

Third, the Revised Manual added a provision that was not present in any form in the 2000 Manual. New provision XII.f provided that "in the event an independent producer takes legal action against AOTV, . . . if said producer loses said legal action or appeal, the producer be [sic] responsible to reimburse AOTV for all legal expenses, consistent with the court decision." (Docket 1, Exhibit D at 22). Plaintiffs' third challenge is to this provision, which will be referred to as the "Legal Expenses Provision."

Last, the 2000 Manual provided that,
> Programs which contain material deemed not suitable for young viewers or explicit material must have a disclaimer to that effect as part of their opening credits. To the extent that the law limits, programs of this nature will be scheduled outside of the prime viewing periods of children.

Docket 1, Exhibit B at 15. The Revised Manual edited this provision as well. The new provision retained the above language, but added a special policy for what it termed "potentially offensive" material. According to this section, AOTV would "cablecast programs which are defined as 'potentially offensive,'" (Docket 1, Exhibit B at 15), but "with a viewer warning in a late night time slot." *Id.* at 16. The Revised Manual defined "potentially offensive" programming as including, but not limited to, (1) "Extreme slang or vulgar language;" (2) "Sexually [sic] activities not defined under obscenity;" (3) "Extreme acts or depictions of violence;" or (4) "Depictions of a graphic nature." *Id.* It further provided that,

---

**4.** Plaintiffs' memorandum also addresses a portion of § VI.d. of the Revised Manual that provides that "[r]ecorded material which seeks to promote the commitment of an illegal act will not be aired." (Docket 3 at 16). However, plaintiffs' motion for preliminary injunctive relief only refers to the provision of

§ VI.d "which prohibits journalists from using AOTV equipment to record an illegal act." *See* Docket 2 at 1. The complaint is likewise limited to the Illegal Act Provision. *See* Docket 1 at 12 ¶ 5; 15, Count VI. Thus, only the Illegal Act Provision is addressed here.

each producer is responsible to notify AOTV on the Air Time Request Form whether his/her programming contains any "potentially offensive" material according to the above guidelines. Should any producer fail to properly disclose the "potentially offensive" nature of the program on the Form, AOTV has the right to suspend or terminate the producer's privileges. Any suspension or termination of privileges will include both the producer and all other persons associated with the production of the program.

*Id.* Defendants have never suggested that plaintiffs' broadcasts contained "potentially offensive material." Nevertheless, plaintiffs object to both the notification requirement and AOTV's assertion of its right to sanction non-compliance. The provision in its entirety will be referred to hereafter as the "Potentially Offensive Provision."

On April 5, 2001, Demarest and Dunn received letters asking them to sign Statements of Compliance with the Revised Manual to confirm their acceptance of the four provisions discussed above. They refused, citing their First Amendment rights. (Docket 1 at 12–13). On April 17, 2001, AOTV informed the plaintiffs that, because of their refusal, they were barred from using AOTV facilities and equipment. (Docket 8 at 12–13).

One point regarding plaintiffs' suspension requires clarification. Initially, AOTV's memoranda in opposition to plaintiffs' motion for preliminary injunction appeared to suggest that the plaintiffs would still be able to broadcast their programming, despite their refusal to sign the Statement of Compliance, so long as they did not use either the station's facility or equipment in *preparing* the program. (Docket 8 at 2, 8). As stated in the Courville affidavit, "[d]espite their refusal to sign AOTV's Policies and Procedures, Plaintiffs Patricia Demarest and Vicki Dunn have never lost their right to have programming cablecast on the Public Access Channel." (Docket 9).

It emerged during oral argument that this statement was untrue. Defense counsel conceded at oral argument that, even if the plaintiffs did not use AOTV facilities or equipment to produce their program, but did all of the preparation using their own equipment and presented a videotape of it to the station for airing, they would still be prohibited from showing the program unless they agreed in writing to abide by the new policies reflected in the Revised Manual.

Plaintiffs brought suit on July 5, 2001, seeking declaratory and injunctive relief under the First and Fourteenth Amendments to the United States Constitution, Article 16 of the Massachusetts Declaration of Rights, 42 U.S.C. § 1983, and the Cable Act. (Docket 1). Specifically, the plaintiffs sought a declaration by this court pursuant to 28 U.S.C. § 2202 that (1) the Release Form Provision, the Illegal Act Provision, the Legal Expenses Provision, and the "Potentially Offensive" Provision were violations of the plaintiffs' constitutional rights; (2) that the July 10, 2000 suspension of Demarest violated her civil rights; and (3) that AOTV's decision not to air the July 9, 2000 Think Tank 2000 episode was a violation of the plaintiffs' civil rights. In addition, the plaintiffs sought attorney's costs and fees pursuant to 42 U.S.C. § 1983. (Docket 1).

Finally, the plaintiffs requested immediate injunctive relief, enjoining AOTV (1) from enforcing the Release Form Provision, the Illegal Act Provision, the Legal Expenses Provision, and the "Potentially Offensive" Provision, and (2) from using the July 10, 2000 suspension of Demarest as grounds for further discipline or curtailment of her use of AOTV equipment, facili-

ties, or air-time. *Id.*[5] This memorandum addresses only the plaintiffs' requests for injunctive relief.

## III. *DISCUSSION*

The standard for a preliminary injunction is well established in the First Circuit.

A party who seeks a preliminary injunction must show: (1) that she has a substantial likelihood of success on the merits; (2) that she faces a significant potential for irreparable harm in the absence of immediate relief; (3) that the ebb and flow of possible hardships are in favorable juxtaposition; and (4) that the granting of prompt injunctive relief will promote the public interest.

*McGuire v. Reilly,* 260 F.3d 36, 42 (1st Cir.2001). The Supreme Court has explained that "the loss of First Amendment freedoms, for even minimum periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Thus, when "First Amendment interests were either threatened or in fact being impaired at the time relief was sought," a preliminary injunction is proper. *Id.* In the following discussion, the preliminary injunction standard will be applied separately to each challenged provision of the Revised Manual.

### A. *State Action*

■ Two preliminary questions are common to all the challenged provisions, and will be addressed initially. The first issue is whether AOTV is a state actor for purposes of the Fourteenth and First Amendments. AOTV must be a state ac-

tor if the plaintiffs are to be permitted to assert their § 1983 claims under the First Amendment. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) ("[I]t is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical."). The second issue is whether AOTV is a "public forum."

The "state actor" issue is more difficult than may appear on the surface. No federal decision cited by the parties, or located by this court, has positively found state action in a PEG case such as this one. One decision in the Southern District of New York, cited by AOTV, found to the contrary, rejecting a PEG programmer's challenge on the ground that the cable provider was not a state actor. *Glendora v. Marshall,* 947 F.Supp. 707, 712 (S.D.N.Y.1996), *aff'd without opinion* 129 F.3d 113, 1997 WL 638239 (2d Cir.1997), *cert. denied* 522 U.S. 1059, 118 S.Ct. 717, 139 L.Ed.2d 657 (1998). According to that court, "the defendants [did] not qualify as 'state actors' ... because 'the ownership and operation of an entertainment facility are not powers traditionally exclusively reserved to the State, nor are they functions of sovereignty.'" *Id., quoting Glendora v. Cablevision Sys. Corp.,* 893 F.Supp. 264, 269 (S.D.N.Y.1995). In an unpublished decision from an earlier stage of the *Glendora* litigation cited above, the Second Circuit noted that "'public access' channels ... are not creatures of federal law," and found that "it is doubtful that TCI can be

---

**5.** Plaintiffs have not requested that AOTV be preliminarily enjoined from using their refusal to sign the statements of compliance as grounds for curtailment of their use of AOTV equipment or facilities. Therefore, no such injunction will be issued, despite the fact that, as will be seen below, several provisions of the Revised Manual are unconstitutional. It is unlikely, in any event, that AOTV will continue to insist on compliance with unconstitutional restrictions as a condition for use of its facilities. If this occurs, plaintiffs are free to seek additional relief from the court.

considered a 'state actor' for purposes of the First Amendment or for Section 1983 liability." *Glendora v. Malone,* No. 96–7068, 101 F.3d 1393, 1996 WL 678982, *1 (2d Cir. 1996).

Plaintiffs argue that the *Glendora* case is easily distinguishable. The subject of the state action inquiry in *Glendora* was the regulated cable operator, rather than the public access channel itself. 947 F.Supp. at 714–715. Thus, the *Glendora* court did not reach the question of whether a public access *channel* may be a state actor. It held only that TCI Cable of Westchester, the cable provider, was not a state actor. *Id.*

While no reported decision involving a PEG channel defendant addresses the state action issue head-on, several cases have treated a PEG channel as a state actor without explicitly addressing the issue. *See e.g., Horton v. Houston,* 179 F.3d 188, 190 n. 3 (5th Cir.1999) (parties did not dispute that PEG channel was state actor on appeal), *cert. denied* 528 U.S. 1021, 120 S.Ct. 530, 145 L.Ed.2d 411 (1999); *Coplin v. Fairfield,* 111 F.3d 1395, 1401–1402 (8th Cir.1997) (assuming that public access television committee was state actor). In other related cases, the defendant was either the cable provider, as in *Glendora,* or a traditional governmental entity, such as the City of New York. *See, e.g., Time Warner Cable of New York City v. New York,* 943 F.Supp. 1357, 1363 (S.D.N.Y. 1996), *aff'd* 118 F.3d 917 (2d Cir.1997).

Thus, whether a PEG channel is a state actor for purposes of the Fourteenth and First Amendments is a somewhat novel question. Plaintiffs argue that AOTV is a state actor because it has a "public function" within the meaning of *Brentwood Academy v. Tennessee Secondary School,* 531 U.S. 288, 121 S.Ct. 924, 930, 148 L.Ed.2d 807 (2001), and its predecessors. Under these cases, "[c]onduct that is for-mally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1965).

Resolving "the dichotomy between state action, which is subject to scrutiny under the [Fourteenth] Amendment's Due Process Clause, and private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be," *NCAA v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), is not always easy. As the Supreme Court has remarked, "[i]t is fair to say that 'our cases deciding when private action might be deemed that of the state have not been a model of consistency.'" *Lebron v. National Railroad Passenger Corp.,* 513 U.S. 374, 378, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), *quoting Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 632, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (O'Connor, J. dissenting). What is clear is that each case must be examined on its facts, and amid the diversity of opinion in the Court's precedents, "examples may be the best teachers." *Brentwood,* 121 S.Ct. at 930.

The most persuasive authority suggests that AOTV *is* a state actor. The Supreme Court's *Lebron* decision is perhaps the most compelling guidepost in this misty area. There, the Court held that when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." 513 U.S. at 400, 115 S.Ct. 961. All of these factors are substantially met here.

First, AOTV was created by the Town of Athol ("Athol") through its license agree-

ment with Time–Warner Cable ("Time–Warner"). (Docket 1, Exhibit A). Athol demanded the creation of AOTV as a condition of Time–Warner's license renewal. *Id.* at 23. Pursuant to this agreement, Time–Warner paid the Board of Selectmen of the Town of Athol (the "Board of Selectmen"), $15,000, followed by payments of $120,000 and $30,000, so that the Board of Selectmen could form, organize, and maintain AOTV and its facilities. *Id.* at 23–24. There can thus be no doubt that AOTV was created by Athol, much like the Bank of the United States was created by the federal government. *See Lebron,* 513 U.S. at 386–391, 115 S.Ct. 961 (describing "long history of corporations created by United States for achievement of governmental objectives.").

The fact that much of AOTV's funding comes from Time–Warner, rather than public coffers, is no evidence of any lack of state action. Time–Warner's contribution to AOTV functions much like a tax or licensing fee. To do business in Athol, Time–Warner must pay for AOTV. *See Denver Area,* 518 U.S. at 734, 116 S.Ct. 2374 (noting that PEG channels "are channels that, over the years, local governments have required cable systems operators to set aside ... as part of the consideration an operator gives in return for permission to install cables under city streets and to use public rights-of-way.").

Second, Athol created AOTV to further public objectives. The licensing agreement provides that AOTV "may be used by the public," and that "[a]ny resident of the Town, or any organization or institution based in the Town, shall have the right to place locally produced programming on the Access Channel." (Docket 1, Exhibit A at 23). The agreement further provides that the channel shall be managed "for the benefit of the community." *Id.* at 25. *See also* H.R.Rep. No. 98–934, 30 ("Public ac-

cess channels ... provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas."). Like the public park in *Evans,* AOTV "serves the community." 382 U.S. at 302, 86 S.Ct. 486.

Third, Athol has retained authority through its Board of Selectmen to appoint *all*—not just a majority—of the members of the "Access Group," which manages and operates AOTV. (Docket 1, Exhibit A at 24). Indeed, at least one of the members of the Access Group is also a member of the appointing Athol Board of Selectmen and a defendant in this case, Foristall. Although the record is not clear as to whether the Board of Selectmen also has the power to remove members of the Access Group, *Lebron* notes that the power of removal is not a necessary condition for state action. *See* 384 U.S. at 398, 86 S.Ct. 1545.

These factors make it highly probable, at least on the facts revealed so far, that AOTV will be found to be a state actor for purposes of the First and Fourteenth Amendments. Like any other entity that is created by the government to serve the community whose directors are appointed by the government, AOTV is bound by the mandates of the First Amendment. Thus, in the remainder of the "substantial likelihood" analysis, AOTV will be treated as a state actor for purposes of evaluating plaintiffs' First Amendment claims.

### B. *Public Forum*

■ Plaintiffs argue that, as well as being a state actor, AOTV is a "public forum" within the meaning of the First Amendment. Again, this question is open to debate.

Justices Kennedy and Ginsburg appear to agree with plaintiffs. In *Denver Area*

*Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996), Justice Kennedy's concurrence made it very clear that he and Justice Ginsburg believed that "[a] public access channel is a public forum." *Id.* at 783, 116 S.Ct. 2374 (concurring in part, dissenting in part). Justice Kennedy observed that a channel like AOTV is "open to programming by the public." *Id.* at 790, 116 S.Ct. 2374. He also pointed out that the House Report "characterized public access channels as 'the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet.' " *Id.* at 791, 116 S.Ct. 2374, *quoting* H.R.Rep. No. 98–934 at 30.

Chief Justice Rehnquist, and Justices Thomas and Scalia would likely disagree. Justice Thomas' dissent in *Denver Area* stated explicitly that he and the Chief Justice, as well as Justice Scalia, believed that "[p]ublic access channels are not public forums." 518 U.S. at 831, 116 S.Ct. 2374 (concurring in the judgment in part, dissenting in part).

For Justice Thomas, the fact that the public access channel in *Denver Area* was private property was most salient. He pointed out that the only Supreme Court cases in which private property had been treated as a public forum were cases "in which the government has held at least some formal easement or other property interest permitting the government to treat the property as its own in designating the property as a public forum." *Id.* at 828, 116 S.Ct. 2374. According to Justice Thomas, neither the Cable Act nor a franchise agreement was sufficient to transform private property into a public forum. "[W]e have never even hinted that regulatory control, and particularly direct regulatory control over a private entity's First Amendment speech rights, could justify creation of a public forum." *Id.* at 829, 116

S.Ct. 2374. Thus, Justice Thomas would have upheld a cable operator's right to prohibit programming on a PEG channel that it "reasonably believes ... depicts sexual ... activities or organs in a patently offensive manner," over the First Amendment rights of the producers and viewers to transmit or watch such programming. *Id.* at 831, 116 S.Ct. 2374.

As might be expected, the plaintiffs take the side of Justice Kennedy, pointing to the public function of AOTV and to the Cable Act House Report, quoted above, which describes PEG channels as the equivalent of a "speaker's soapbox." AOTV takes the side of Justice Thomas and argues that because AOTV is private property, it cannot be a public forum.

The plurality in *Denver Area* declined to decide the public forum issue. According to the plurality, the "categorial approaches" of Justices Kennedy and Thomas lacked flexibility. *Id.* at 727, 116 S.Ct. 2374. Justice Breyer wrote:

> [A]ware as we are of the changes taking place in the law, the technology, and the industrial structure relating to telecommunications, we believe it unwise and unnecessary definitively to pick one analogy or one specific set of words now. We therefore think it premature to answer the broad questions that Justices Kennedy and Thomas raise in their efforts to find a definitive analogy, deciding for example, the extent to which private property can be designated a public forum, whether public access channels are a public forum, whether exclusion from common carriage must for all purposes be treated like exclusion from a public forum, and whether the interests of the owners of the media always subordinate the interests of all other users of a medium.

518 U.S. at 742–743, 116 S.Ct. 2374 (internal citations omitted).[6]

However, the Breyer plurality was not entirely neutral. It did not deny that public access channels had some of the characteristics of a public forum, and concluded that restrictions on their use were deserving of heightened, if not strict, scrutiny. The *Denver Area* plurality disavowed "definitive categorical analysis," 518 U.S. at 774, 116 S.Ct. 2374 (Souter, J. concurring), and "a definitive analogy," 518 U.S. at 742, 116 S.Ct. 2374 (plurality opinion), but *not* heightened First Amendment scrutiny. This conclusion is borne out by the Court's holding that the "segregate and block" restrictions in *Denver Area* were not narrowly or reasonably tailored, and thereby "sacrific[ed] important First Amendment interests for too speculative a gain." 518 U.S. at 760, 116 S.Ct. 2374 (quotations omitted).

Justice Kennedy described the plurality as "settling for synonyms." 518 U.S. at 786, 116 S.Ct. 2374 (concurring in part, dissenting in part). As he put it, in the plurality opinion " '[c]lose judicial scrutiny' is substituted for strict scrutiny, and 'extremely important problem,' or 'extraordinary problem,' is substituted for 'compelling interest.' " *Id.* (citations omitted). He objected further that, "[w]e are told the Act must be 'appropriately tailored,' 'sufficiently tailored,' or 'carefully and appropriately addressed,' to the problems at hand—anything, evidently, except 'narrowly tailored.' " *Id.*

Fortunately, this motion does not require the court to resolve the *Denver Area* conundrum. Six Justices of the Court agree, at least, that heightened scrutiny applies, as can be seen from the opinions of Justices Breyer and Kennedy. Six Justices also agree that individual public forum cases provide useful analogies when analyzing First Amendment challenges to restrictions on PEG channels. *See* 518 U.S. at 747, 116 S.Ct. 2374 (plurality opinion) (*"Pacifica* provides the closest analogy"), and 518 U.S. at 791, 116 S.Ct. 2374 (Kennedy, J., concurring in part and dissenting in part) (discussing and comparing public forum cases). Thus, a court that analyzes a PEG restriction with "heightened" scrutiny, and by analogy to other cases can be sure, at least, that its standard will not be overly demanding.

Viewed in this light, the issues raised by this case are not particularly difficult. As will be seen, two provisions of the Revised Manual are manifestly content-based, and therefore under well established Supreme Court authority must be subject to strict scrutiny, in any event. The other two provisions fit comfortably within the evaluative framework established by the plurality in *Denver Area.* Therefore, at this time, the court need not decide whether AOTV is, as a technical matter, a "public forum" for purposes of deciding the motion for preliminary injunction.

## C. *Revised Manual Provisions*

### 1. *Release Form Provision*

■ The Release Form Provision is not likely to survive heightened scrutiny. As noted, the 2000 Manual contained a provision stating that "release forms for persons recording during [electronic news gathering (ENG)] are not required." (Docket 1, Exhibit B at 15). The Revised Manual eliminated this exemption.

---

**6.** In light of this fractured decision, it is unsurprising that the only other court in the First Circuit to address the issue found "no precedent for treating a cable access channel as [a public forum]." *See Eane v. Town of Auburn,* 176 F.R.D. 433 (D.Mass.1997) (order denying preliminary injunction).

If the Release Form Provision were challenged merely on its face, the question might be difficult. For example, the provision, as written, might be interpreted to refer only to copyrighted material. But this was not merely a facial challenge. Demarest was suspended for thirty days for failing to "obtain[ ] all necessary releases ... from individual(s)," and challenged the provision as applied to her. In particular, the Suspension Letter confirmed that the Release Form Provision was being applied to require release forms from *all* persons whose voices or images were recorded for PEG broadcasts as part of electronic news gathering.

The only motive AOTV articulated in support of this policy lacked any sound basis and clearly established that the provision is not aimed at "an extremely important problem." In its Opposition Memorandum, AOTV suggested that the "guidelines [were] designed to protect community residents." (Docket 8 at 9). It argued that if the court allowed the plaintiffs' motion, it "would effectively eliminate any protection these residents may have against abuses of access resources. The Plaintiffs could continue to tape individuals without obtaining proper releases and violate residents' rights of privacy and publicity." *Id.*

It is doubtful whether, consistent with the First Amendment, AOTV may so entirely subordinate the plaintiffs' right of expression to citizens' privacy rights. PEG channels are established to "provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas." H.R.Rep. No. 98–934, at 30 (1984), reprinted in 1984 U.S.C.C.A.N. at 4667. This is borne out by AOTV's franchise agreement, which provides that AOTV shall not "have editorial control over the content of any Public Access programming placed on the channel." (Docket 1, Exhibit A at 23). The Release Form Provision effectively gives any person, even a public figure, veto power over any AOTV broadcast no matter how newsworthy.

Even if the Release Form Provision might in some contexts serve a reasonable purpose, it was not, as applied, "sufficiently tailored." It put a suffocatingly impracticable burden upon electronic news gathering by requiring a release form from every recorded person. Obtaining a release form from every person who was recorded, for example, at a picket line, a protest, a city street, or a town meeting is simply infeasible.

At base, plaintiffs had a constitutionally protected right to record matters of public interest, *see Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir.2000), *cert. denied* 531 U.S. 978, 121 S.Ct. 426, 148 L.Ed.2d 435 (2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir.1995). This right was not unlimited, of course. Plaintiffs, for example, could not have invaded private homes, no matter how newsworthy the subject. *Cf. Wilson v. Layne*, 526 U.S. 603, 612, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (finding that First Amendment rights of press did not justify allowing reporters to ride along with police on warrant executions in private homes). Similarly, the plaintiffs did not have an unlimited right to publicize private facts. *See Virgil v. Time, Inc.*, 527 F.2d 1122, 1128 (9th Cir.1975) ("[w]e conclude that unless it be privileged as newsworthy ... the publicizing of private facts is not protected by the First Amendment."). *See also Gilbert v. Medical Economics Co.*, 665 F.2d 305, 308 (10th Cir.1981) (same); *Veilleux v. National Broadcasting Co.*, 8 F.Supp.2d 23, 40 n. 8 (D.Me.1998) (same). However, as applied to these plaintiffs, the Release Form provision made no distinc-

tion between the newsworthy and the mundane, or between matters of public interest and purely private matters.

Rather than being tailored to protect legitimate interests in privacy, the Release Form Provision made Athol's news makers news editors. By refusing to sign a release form, Athol's news makers could ensure that their images did not appear on AOTV. It is highly probable that the filming which gave rise to Demarest's suspension will be found to be constitutionally protected.[7]

Focusing on the facts of this case, it is important to underline that the Release Form Provision was applied to protect Chiasson, a local public official. As Justice Frankfurther has stated, "[o]ne of the prerogatives of American citizenship is the right to criticize public men and resources." *Baumgartner v. United States,* 322 U.S. 665, 673–674, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944). Demarest's criticism of Foristall (a member of AOTV's board and the Athol Board of Selectmen) for having a conflict of interest and of Chiasson (a member of Athol's Needs Assessment Committee) for receiving special treatment exemplified this right. In *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), the Supreme Court noted that, "[t]he sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office." *Id.* at 51, 108 S.Ct. 876. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court explained that "[a]n individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might other-

wise be the case." *Id.* at 344, 94 S.Ct. 2997. In sum, while the Release Form Provision might, to some extent, be defended in the abstract as a protection of privacy, its potential perniciousness is well demonstrated by the way it has been applied in this case.

In addition, it is clear that the Release Form Provision caused irreparable harm. As noted above, "the loss of First Amendment freedoms, for even minimum periods of time, unquestionably constitutes irreparable injury." *Elrod,* 427 U.S. at 373, 96 S.Ct. 2673. The Release Form Provision resulted in Demarest's suspension, and has contributed to prohibiting Demarest and Dunn from producing and cablecasting "Think Tank 2000" for over a year now. This is more than sufficient to support a finding of irreparable harm.

The balance of harms weighs in the plaintiffs' favor as well. As noted above, AOTV may not so crudely subordinate the First Amendment rights of the plaintiffs to some unlimited notions of privacy. Its mission is to provide the community with a channel open to diverse programming. AOTV will not suffer the slightest injury by issuance of the injunction. Plaintiffs, on the other hand, face irreparable harm if the injunction is not granted.

The public interest prong of the analysis also supports issuance of the injunction. "At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler,* 485 U.S. at 50, 108 S.Ct. 876. Even if it were true, as Chiasson allegedly complained, that the plaintiffs "do not get their facts straight," the "freedom to speak one's mind is . . . a good unto itself [and]

---

**7.** It should be noted that the plaintiffs make a very plausible argument that the Release Form Provision constitutes a prior restraint.

As the above analysis makes clear, however, the court need not decide that issue for purposes of issuing the preliminary injunction.

... essential to the common quest for truth and the vitality of society as a whole." *Id.* at 51, 108 S.Ct. 876.

For these reasons, the public interest will be served by allowing an injunction prohibiting AOTV from requiring release forms from all persons recorded for AOTV programs. Similarly, the plaintiffs' request that AOTV be enjoined from using the Demarest suspension as grounds for further discipline or curtailment of her use of AOTV equipment or facilities will be allowed. It was almost certainly unconstitutional to suspend Demarest for failing to get release forms from Chiasson and Britt. Thus, to further penalize Demarest for this constitutionally protected use of AOTV facilities and equipment would almost certainly be unconstitutional.

### 2. *Illegal Act Provision*

■ Plaintiffs are also likely to show that the Illegal Act Provision is unconstitutional. The provision is unquestionably content-based; it forbids recording an "illegal act." Thus, it "by [its] terms distinguish[es] favored speech from disfavored speech." *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). The fact that the Illegal Act Provision does not single out a particular viewpoint is irrelevant; the regulation targets an entire subject-matter. *See U.S. v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 811, 120 S.Ct. 1878, 146 L.Ed.2d 865 (statute aimed at "sexually explicit programming" was content-based.); *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").

These authorities make it clear that the Illegal Act Provision is subject to the highest scrutiny. *See Turner,* 512 U.S. at 642, 114 S.Ct. 2445 ("Our precedents ... apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."). Not surprisingly, the provision cannot survive this test. Although the Revised Manual explains that "[t]he recording of an illegal act is not permitted as it may lead to harm to the equipment," docket 1, Exhibit D at 12, AOTV's interest in protecting its equipment is not sufficient to justify such an unqualified ban on content.

As an initial matter, the Damaged Equipment Provision adequately addresses any interest AOTV has in its equipment. As noted, this provision properly holds the producer responsible for repairing or replacing stolen, lost, or damaged equipment. Thus, AOTV can be sure that those who break their equipment will pay for it.

More importantly, the Illegal Act Provision is so broad as to dwarf any interest in equipment safety. The provision would have restricted PEG producers from capturing on film some of the most important moments in American history. For example, an AOTV producer would have been forbidden from filming John Lewis as he marched on Bloody Sunday. According to Mr. Lewis, something about the Bloody Sunday attack in Selma, Alabama, and the fifteen minutes of film footage that accompanied the ABC television report "touched a nerve deeper than anything that had come before." John Lewis & Michael D'Orso, *Walking With the Wind: A Memoir of the Movement,* 344 (1998). Mr. Lewis reported that:

> The images [of the ABC footage] were stunning—scene after scene of policemen on foot and on horseback beating defenseless American citizens.... This was a faceoff in the most vivid terms between a dignified, composed, com-

pletely nonviolent multitude of silent protestors and the truly malevolent force of a heavily armed, hateful battalion of troopers. The sight of them rolling over us like human tanks was something that had never been seen before. People just couldn't believe this was happening, not in America.

*Id.* at 344–345. According to Mr. Lewis, the national broadcast of this footage was a turning point in the civil rights movement. However, if the ABC cameraperson had been governed by a clause like the Illegal Act Provision, the footage never would have been shown to the American public. Such a ban on content cannot be sustained.

A lengthy analysis of the remaining prongs of the preliminary injunction standard is unnecessary. The ban on content obviously has significant potential to cause irreparable harm to AOTV producers. The "balance of harm" and "public interest" factors also weigh decidedly in the plaintiffs' favor. The motion to enjoin the enforcement of the Illegal Act Provision will be allowed.

### 3. *Legal Expenses Provision*

■ The Legal Expenses Provision requires a producer to agree to pay AOTV's legal costs if the producer sues AOTV or its affiliates and loses. Plaintiffs rightly complain that this provision implicates their First Amendment right to seek redress in the courts for constitutional wrongs. *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) ("the right of access to the courts is an aspect of the First Amendment right to petition the

Government for redress of grievances."). As the plaintiffs point out, this provision infringes their First Amendment rights on several levels: In order to exercise their First Amendment right to speak on AOTV, the plaintiffs must agree to this extra deterrent to their exercise of First Amendment rights.[8]

Plaintiffs are likely to show that this provision will not survive heightened scrutiny. The Supreme Court has warned federal courts to "be vigilant when Congress imposes rules and conditions which in effect insulate its own laws from legitimate judicial challenge. Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Legal Services Corp. v. Velazquez,* 531 U.S. 533, 548–549, 121 S.Ct. 1043, 1052, 149 L.Ed.2d 63 (2001). No less vigilance is required when a local authority seeks to insulate its actions from legitimate judicial challenge.

In *Velazquez,* the Court noted that the legislation at issue "operate[d] to insulate current welfare laws from constitutional scrutiny and certain other legal challenges, a condition implicating central First Amendment concerns." *Id.* at 547, 121 S.Ct. 1043. In the same way, the Legal Expenses Provision attempted to insulate AOTV's conduct and regulations from scrutiny in courts of law. Plaintiffs' imperviousness to the chilling effect of the Legal Expenses Provision does not diminish its essential purpose: to pressure AOTV producers to stay out of court. This is not permitted.

As with the analysis in the preceding sections, this provision is likely to cause

---

**8.** Note that the Legal Expenses Provision does not affect only "baseless suits." This limitation would perhaps have given it firmer constitutional footing. *See Bill Johnson's Restaurants,* 461 U.S. at 743, 103 S.Ct. 2161 ("Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition.") (citations omitted). Instead, it applies to all legal actions against AOTV, no matter how colorable, in which the litigant eventually loses.

irreparable harm to the plaintiffs, the balance of harms weighs in the plaintiffs' favor, and the public interest favors allowance of the motion for a preliminary injunction. AOTV, like any other litigant, will have recourse to attorney's fees and costs when proper general authority renders such an award appropriate. The defendants can claim no special protection. Therefore, the preliminary injunction will issue for this provision as well.

### 4. *"Potentially Offensive" Provision*

■ The Potentially Offensive Provision presents the most difficult issue. Plaintiffs attack this provision on its face, and the Supreme Court has cautioned that "[i]nvalidating any rule on the basis of its hypothetical application to situations not before the Court is 'strong medicine' to be applied 'sparingly and only as a last resort.'" *FCC v. Pacifica Foundation*, 438 U.S. 726, 743, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), *quoting Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). "Both the content and the context of speech are critical elements of First Amendment analysis." *Id.* The First Circuit adds that "a party who mounts a facial challenge to a statute must carry a significantly heavier burden than one who seeks merely to sidetrack a particular application of the law." *McGuire v. Reilly*, 260 F.3d 36, 46–47 (1st Cir.2001).

> In the First Amendment context, this means that a plaintiff who challenges a statute on its face ordinarily must show either that the law admits of no valid application or that, even if one or more valid application exists, the law's reach nevertheless is so elongated that it threatens to inhibit constitutionally protected speech.

*Id.* at 47.

The Potentially Offensive Provision unquestionably "regulates speech based upon its content." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Producers are required to flag programming which contains "extreme slang or vulgar language", "sexual activities", "extreme acts or depictions of violence", or "depictions of a graphic nature." (Docket 1, Exhibit D at 16). Thus, "the speech in question is defined by its content." *Playboy*, 529 U.S. at 811, 120 S.Ct. 1878. As the Supreme Court has explained, the standard for reviewing a content-based regulation is strict scrutiny. *Id.* at 814, 120 S.Ct. 1878. Thus, the Potentially Offensive Provision must be narrowly tailored to promote a compelling interest. *Id.* at 813, 120 S.Ct. 1878.

Despite this favorable standard of review, the plaintiffs have not shown, for purposes of the preliminary injunction, that the Potentially Offensive Provision—on its face and without the context of an actual controversy—is not narrowly tailored to promote a compelling interest. The Supreme Court has recognized "special justifications for regulation of the broadcast media that are not applicable to other speakers." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). In *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), the Court noted the "invasive" character of broadcasting, and its ability to "intrude on the privacy of the home without prior warning as to program content." *Id.* at 127–128, 109 S.Ct. 2829. In *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), the Court rejected the notion that "the First Amendment prohibits all governmental regulation that depends on the character of speech." *Id.* at 744, 98 S.Ct. 3026.

AOTV, as the administrator of a PEG channel that may "intrude on the privacy

of the home," may well successfully demonstrate that it does have a compelling interest in ensuring, for example, that depictions of sexual activity are not broadcast without warning and at hours when children are most likely to watch. "[B]roadcasting is uniquely accessible to children," *Pacifica,* 438 U.S. at 726, 98 S.Ct. 3026, and AOTV may well be able to show that the Potentially Offensive Provision is aimed at protecting children. Thus, "[t]he ease with which children may obtain access to broadcast material," justifies AOTV in taking steps to ensure that "the pig" does not "enter[ ] the parlor" during prime-time viewing hours. *Pacifica,* 438 U.S. at 750–751, 98 S.Ct. 3026.

Further, the Potentially Offensive Provision, like the regulation in *Pacifica,* does not attempt to ban the regulated content totally. *See Sable,* 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (noting that distinguishing features of *Pacifica,* were lack of a total ban and the unique attributes of broadcasting). Instead, it seeks merely to identify programming which would justify a viewer warning and might be more appropriate for later viewing hours. This restriction imposes a minimal burden on producers, who are most familiar with the content of their programs. The mere possibility of a sanction on the face of the regulation does not alter this analysis. As Justice Kennedy noted in *Denver Area,* "time segregation" and "adult content advisories" on PEG programming were "measures, that if challenged, would likely survive strict scrutiny as narrowly tailored to safeguard children." 518 U.S. 727, 808, 116 S.Ct. 2374, 135 L.Ed.2d 888 (concurring in part, dissenting in part). Thus, the plaintiffs are unlikely to prove that the Potentially Offensive Provision is unconstitutional on its face.

It is also unlikely that the plaintiffs can prove that the Potentially Offensive Provision is unconstitutionally vague. "A statute can be impermissibly vague for either of two reasons: first, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; and, second, if it authorizes or even encourages arbitrary or selective enforcement." *Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

Plaintiffs suggest that the Potentially Offensive Provision fails on both accounts. They argue first that the examples given by the provision are not defined, and may require some guesswork on the part of producers seeking to comply. That argument is obviously correct to some extent, but "because we are condemned to the use of words, we can never expect mathematical certainty from our language." *Id.* at 733, 120 S.Ct. 2480 (quotations omitted). The Potentially Offensive Provision requires producers to flag programming which contains "extreme slang or vulgar language," "sexual activities," "extreme acts or depictions of violence," or "depictions of a graphic nature." (Docket 1, Exhibit D at 16). While there is admittedly some ambiguity in these terms, most are "common words" that a producer of ordinary intelligence would understand. *Hill,* 530 U.S. at 732, 120 S.Ct. 2480.

For much the same reasons, the plaintiffs are not likely to show that the Potentially Offensive Provision authorized or even encouraged arbitrary or selective enforcement. No facts supporting such a claim have been offered. The Potentially Offensive Provision is not a criminal law, like the statutes in *Hill* or *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), which the plaintiffs cited. In sum, the plaintiffs have not convincingly demonstrated that they are likely to succeed in showing that the Potentially

Offensive Provision is unconstitutionally vague.

For these reasons, the plaintiffs have not met their burden of showing that they are likely to succeed on the merits of this claim. Without this showing, an analysis of the other prongs of the injunction standard is unnecessary. Plaintiffs' request for a preliminary injunction enjoining AOTV from enforcing the Potentially Offensive Provision will be denied.

If AOTV, as plaintiffs fear, applies the Potentially Offensive Provision in an unconstitutional way, plaintiffs may seek injunctive relief at that time "in a concrete setting." *McGuire*, 260 F.3d at 47. As noted, such challenges will be reviewed under strict scrutiny. A program featuring political criticism, such as the Think Tank 2000 broadcasts discussed here, seems unlikely to qualify as "potentially offensive." In the meantime, plaintiffs retain the ability to prove their case on the merits, without the benefit of an injunction.

## IV. CONCLUSION

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is hereby allowed with respect to (1) the provision of the March 21, 2001 policies and procedures that requires release forms from all people whose voice or likeness appears in AOTV broadcasts, (2) the provision that prohibits the recording of any illegal act, and (3) the provision that requires producers to indemnify AOTV for legal fees when they do not prevail in a legal action against AOTV. The motion that AOTV be enjoined from using Demarest's suspension as grounds for further discipline or curtailment of her use of AOTV equipment or facilities is also hereby allowed. The motion for a preliminary injunction is hereby denied with respect to the provision that requires producers to notify AOTV when a broadcast contains material that is "potentially offensive."

## ORDER

For the reasons stated in the accompanying Memorandum, plaintiffs' motion for a preliminary injunction is hereby allowed with respect to (1) the provision of the defendants' March 21, 2001 Policies and Procedures Manual that requires release forms from all people whose voice or likeness appears in AOTV broadcasts, (2) the provision of the same manual that prohibits the recording of any illegal act, and (3) the provision of the manual that requires producers. to indemnify AOTV for legal fees when they do not prevail in a legal action against AOTV. The motion that AOTV be enjoined from using Ms. Demarest's suspension as grounds for further discipline or curtailment of her use of AOTV equipment or facilities is also hereby allowed.

The motion for a preliminary injunction is hereby denied with respect to the provision that requires producers to notify AOTV when a broadcast contains material that is "potentially offensive."

The clerk will set a date for a status conference to establish a schedule for future proceedings.

It is So Ordered.