56 A.3d 869

KELLY RAMOS, PLAINTIFF–APPELLANT, v. HERBERT FLOW-
ERS, DEFENDANT–RESPONDENT, AND TRENTON POLICE
DIVISION; THE CITY OF TRENTON; TRENTON POLICE DI-
RECTOR JOSEPH SANTIAGO, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued February 16, 2012—Decided September 21, 2012.

16

Before Judges CUFF, WAUGH, and ST. JOHN.

*Patrick J. Whalen* argued the cause for appellant.

*Stacy L. Moore, Jr.*, argued the cause for respondent (*Parker McCay, P.A.*, attorneys; *Lisa Roberts Taylor*, on the brief).

*Jonathan M. Manes (Gibbons)* of the New York bar, admitted pro hac vice, argued the cause for amicus curiae American Civil Liberties Union of New Jersey (*Gibbons and ACLU of NJ*, attorneys; *Mr. Manes, Lawrence S. Lustberg, Edward L. Barocas, Jeanne LoCicero*, and *Alexander R. Shalom*, on the brief).

The opinion of the court was delivered by

WAUGH, J.A.D.

Plaintiff Kelly Ramos appeals the Law Division's April 29, 2011 order granting defendant Herbert Flowers' motion for summary judgment and dismissing his complaint with prejudice. We reverse and remand for further proceedings consistent with this opinion.

I.

We discern the following facts and procedural history from the record on appeal. Because we are reviewing a motion for summary judgment, we outline the facts in the light most favorable to Ramos, the non-moving party. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995).

A.

Ramos is a documentary filmmaker. In 2006, he was working on a project about the emergence of gangs in Trenton. Flowers is

a police officer employed by the Trenton Police Department. Ramos contends that he had five encounters with the Trenton Police during the time he was filming the activities of various members of the "Sex Money Murder" Bloods sect, one of the largest Bloods gang units in Trenton. Three of the encounters involved Flowers. He alleges that Flowers' actions during those three encounters interfered with his constitutional rights to free speech and assembly, as well as his right to be free from unlawful police search and seizure.

On May 12, 2006, Ramos attended a birthday party in Trenton. Several known gang members were also in attendance. They were socializing and drinking alcohol "out front of private property." When the Trenton police arrived at the scene, Ramos was filming and "had positioned his vehicle in such a way so that its headlights shone on the participants of the party." Ramos explained what he was doing to the police. Nevertheless, Ramos was arrested and charged with obstructing traffic, contrary to *N.J.S.A.* 39:4–67; improper parking, contrary to *N.J.S.A.* 39:4–135; leaving an unattended vehicle running, contrary to *N.J.S.A.* 39:4–137; and obstructing a public passage on a sidewalk, contrary to *N.J.S.A.* 2C:33–7.

In another incident that occurred shortly thereafter, Ramos was "filming on a public sidewalk and creating no hazard or interference with anyone else. Trenton Police Officers arrived at the scene ... and very sternly demanded [that Ramos] turn his camera off."

On May 20, 2006, Ramos was driving in Trenton, "again in the process of obtaining video for the documentary." Police officers pulled him over when they noticed that he was filming. They cited Ramos for improperly parking within an intersection, contrary to *N.J.S.A.* 39:4–138(a). According to Ramos, he was only parked within the intersection because he had been pulled over by the police.

On July 2, 2006, Ramos arrived at a Trenton park where police officers were "shutting down" a barbeque attended by a large

number of known gang members. Ramos started filming the interaction between the police and the gang members. He was asked by the police to move across the street, but allowed to continue filming once he did so.

Approximately ten minutes after Ramos had relocated, Flowers approached him and told him that "something would happen to him" if he did not stop filming. Flowers also told him that he was going to investigate his "so-called" documentary. Nevertheless, Ramos continued filming from across the street and only stopped when he had finished.

On July 6, 2006, the Trenton police responded to a call from the Trenton Public Library to investigate a meeting being held by known gang members on its premises. One of Ramos's sources gave him a tip that he should go to the library to film the events as they unfolded. Once Ramos arrived at the library, Flowers told him he was interfering with a police investigation, adding: "I am sick of you already, I am sick of seeing you, I do not want to hear you anymore, you are not allowed here anymore." Ramos asserts that Flowers grabbed his video camera and put it in his car. Flowers then told Ramos: "If I see you again ... I am locking you up and I don't care what for ... you better not let me see you again ... watch what happens."

Ramos contends that he stopped working on his documentary after the July 6 encounter at the library because he feared Flowers would arrest him for no reason and ruin his life. Ramos subsequently licensed some of his gang footage to the History Channel, for which he was paid. He does not allege that he suffered any emotional distress, physical harm, or damage to his property.

In January 2007, the citations Ramos received on May 12, 2006 were dismissed, with one exception. The citation for obstructing a sidewalk was downgraded to a city ordinance violation, after which Ramos pled guilty and paid a fine.

## B.

Ramos filed a three-count complaint on May 12, 2008. Counts one and two asserted claims against Flowers under the New Jersey Civil Rights Act (Act), *N.J.S.A.* 10:6–1 to –2. The first count was based on the allegation that Flowers interfered with Ramos's free-speech rights under Article I, paragraphs 6 and 18 of the New Jersey Constitution, as well as the First Amendment to the United States Constitution. The second count alleged that Flowers violated Ramos's rights to be free from unlawful search and seizure under Article I, paragraph 7 of the New Jersey Constitution and the Fourth Amendment to the United States Constitution. The third count, which asserted claims against the Trenton Police Department, the City of Trenton, and the then police director, was subsequently dismissed by consent. Flowers answered the complaint, denying its material allegations.

Following discovery, Flowers filed a motion for summary judgment, arguing that Ramos's claims were barred by the doctrine of qualified immunity. Neither party having requested oral argument, the motion judge decided the motion on the papers submitted by both sides. He put an oral decision on the record on April 29, 2011.

The motion judge determined that Flowers was entitled to qualified immunity on the Civil Rights Act claims, because he found there was no well-established right to videotape the police at the time of the incidents involving Flowers. He relied primarily on *Kelly v. Borough of Carlisle*, 622 *F*.3d 248 (3d Cir.2010). In that case, the Third Circuit concluded that "there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment." *Id.* at 262. With regard to the May 12, 2006 arrest, the judge held that Ramos's guilty plea demonstrated his acknowledgement of probable cause for his arrest. The judge entered an order granting summary judgment and dismissing the complaint.

This appeal followed. We granted the motion of the American Civil Liberties Union of New Jersey (ACLU) to appear and argue amicus curiae. ·

## II.

On appeal, Ramos argues that the motion judge erred (1) in applying qualified immunity to actions brought under the Civil Rights Act and (2) in dismissing his unlawful arrest claims.

### A.

It is well-established that our review of the motion judge's conclusions of law is de novo. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."). We apply the same standard as the trial court under *Rule* 4:46–2(c). *Brill, supra,* 142 *N.J.* at 539–40, 666 *A.*2d 146. In addressing a motion for summary judgment, a judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Id.* at 540, 666 *A.*2d 146; *see also R.* 4:46–2(c).

### B.

We turn first to Ramos's argument that the motion judge erroneously applied the defense of qualified immunity to his claims under the Civil Rights Act.

*N.J.S.A.* 10:6–2(c) provides:

Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under

color of law, may bring a civil action for damages and for injunctive or other appropriate relief. The penalty provided in subsection e. of this section shall be applicable to a violation of this subsection.

The Act was adopted in 2004 "for the broad purpose of assuring a state law cause of action for violations of state and federal constitutional rights and to fill any gaps in state statutory anti-discrimination protection." *Owens v. Feigin*, 194 *N.J.* 607, 611, 947 *A.*2d 653 (2008) (citations omitted).

We have recognized two types of claims under the Act: first, a claim for when one is "deprived of a right," and second, a claim for when one's "rights are interfered with by threats, intimidation, coercion or force." *Felicioni v. Admin. Office of Courts*, 404 *N.J.Super.* 382, 400, 961 *A.*2d 1207 (App.Div.2008), *certif. denied*, 203 *N.J.* 440, 3 *A.*3d 1228 (2010). Interference with a right need not actually result in actual deprivation of the right. *Ibid.*

Unlike the New Jersey Tort Claims Act (TCA), *N.J.S.A.* 59:1-1 to 12-3, the text of the Civil Rights Act does not contain or refer to any immunities. Although no immunities are contained in the text of 42 *U.S.C.A.* § 1983, the federal equivalent of the Act, it has long been interpreted as allowing the affirmative defense of qualified immunity. *See Schneider v. Simonini*, 163 *N.J.* 336, 353–55, 749 *A.*2d 336 (2000) (citing cases), *cert. denied*, 531 *U.S.* 1146, 121 *S.Ct.* 1083, 148 *L.Ed.*2d 959 (2001); *Kirk v. City of Newark*, 109 *N.J.* 173, 179–84, 536 *A.*2d 229 (1988) (citing cases). *See also Gomez v. Toledo*, 446 *U.S.* 635, 640, 100 *S.Ct.* 1920, 1924, 64 *L.Ed.*2d 572, 577–78 (1980).

Ramos and the ACLU argue that the motion judge erred by applying the qualified-immunity defense applicable in cases brought under § 1983 to cases brought under the Act.[1] Flowers

---

[1] 42 *U.S.C.* § 1983 states, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

argues that he is entitled to those immunities *and* the immunities conferred by the TCA.

■ In *Owens, supra,* 194 *N.J.* at 614, 947 *A.2d* 653, our Supreme Court surveyed the legislative history of the Civil Rights Act and found no indication that the Legislature intended to apply the notice requirements of the TCA to actions brought under its provisions. Consequently, the Court concluded that they were inapplicable. Based upon our review of the legislative history, we reach a similar conclusion with respect to the statutory immunities contained in the TCA. There is nothing in the text of the Act or its legislative history to suggest that the Legislature intended the TCA immunities to apply to actions brought under the Act.

■ We now address the issue of whether the affirmative defense of qualified immunity applied in § 1983 cases is also applicable in actions brought under the Civil Rights Act. The Statement to Assembly Bill 2073 (February 9, 2004) provides, in part, as follows:

> This bill attempts to provide the citizens of New Jersey with a *State* remedy for deprivation or interference with the civil rights of an individual. By providing this remedy, the bill attempts to address any potential gaps which may exist under remedies currently in the law.

The reference to "potential gaps" under current remedies could be construed as evidencing legislative intent to provide a state law remedy that would not be subject to the defense of qualified immunity available in cases brought under § 1983. However, subsequent legislative history convinces us that this was not the Legislature's intention.

The Assembly Judiciary Committee's Statement on releasing the bill (February 19, 2004) clarifies the language quoted above and precludes such a reading of its language.

> This bill attempts to provide the citizens of New Jersey with a *State* remedy for deprivation of or interference with the civil rights of an individual. By providing

---

injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

this remedy, the bill is intended to address potential gaps which may exist under remedies currently provided by New Jersey's "Law Against Discrimination," *N.J.S.A.* 10:5–1 et seq., and the law authorizing a civil cause of action for bias crime victims, *N.J.S.A.* 2A:53A–21.

In addition, the same statement provides that the bill was "modeled on the federal civil rights law which provides for a civil action for deprivation of civil rights (42 *U.S.C.A.* § 1983), the Massachusetts Civil Rights Act (MA ST 12 § 11H et seq.) and the Maine Civil Rights Act (5 Me.Rev.Stat. Ann. § 4681 et. seq.)." Similar language is contained in the statement issued by the Senate Judiciary Committee (May 6, 2004).[2]

The committee statements make it clear that the "gaps" referred to in the bill statement cannot be construed as an indication that the Legislature sought to avoid the application of the qualified-immunity defense available in § 1983 cases. There is no suggestion in the overall legislative history that the Legislature intended to circumvent the qualified-immunity defense applicable to § 1983 as a matter of judicial interpretation and application of common-law principles.

Like our Civil Rights Act, neither of the two state statutes cited in the committee statements specifically provides for the application of qualified immunity. In *Duarte v. Healy*, 405 *Mass.* 43, 537 *N.E.*2d 1230, 1232–33 (1989), the Massachusetts Supreme Judicial Court held that qualified immunity is applicable to discretionary acts under the Massachusetts Civil Rights Act, *Mass. Gen. Laws* ch. 12, §§ 11H & 11I (1982). Similarly, because Maine's Civil Rights Act, *Me.Rev.Stat. Ann.* tit. 5, §§ 4681–4685 (Supp.1993), was "patterned after 42 *U.S.C.[A.]* § 1983," courts have determined that qualified immunity is applicable in defending action under that statute. *Hegarty v. Somerset Cnty.*, 848 *F.Supp.* 257,

---

[2] We note that there was also a gubernatorial signing statement, which provided that the bill did not "waive immunities." *Owens, supra*, 194 *N.J.* at 612, 947 *A.*2d 653 (quoting Office of the Governor, Press Release at 1 (Sept. 10, 2004)). Although the statement supports our interpretation, we do not rely on it because "signing statements do not carry the interpretive force afforded to statements from the Legislature." *Id.* at 612 n. 3, 947 *A.*2d 653.

269 (D.Me.1994), *aff'd*, 53 *F.*3d 1367 (1st Cir.1995). *See Norton v. Hall*, 834 *A.*2d 928, 933 n. 3 (Me.2003). *See also Berube v. Conley*, 506 *F.*3d 79, 85 (1st Cir.2007).

We conclude that the Legislature anticipated that New Jersey courts would apply the well-established law concerning the affirmative defense of qualified immunity in adjudicating damage claims under the Act. The motion judge's consideration of qualified immunity as an available defense to damage claims in this case was, therefore, not error.

■ However, "[d]octrines of immunity have not been held to bar injunctive remedies in § 1983 cases." *T & M Homes, Inc. v. Mansfield*, 162 *N.J.Super.* 497, 520, 393 *A.*2d 613 (Law Div.1978) (citing *Wood v. Strickland*, 420 *U.S.* 308, 314 n. 6, 95 *S.Ct.* 992, 997, 43 *L.Ed.*2d 214, 221 (1975)). *See also Denius v. Dunlap*, 209 *F.*3d 944, 959 (7th Cir.2000). Therefore, to the extent the judge applied qualified immunity in considering Ramos's prayer for injunctive relief, the judge erred as a matter of law.

## C.

■ We now turn to the issue of whether Flowers' alleged interference with Ramos's efforts to create a documentary concerning gangs implicated Ramos's constitutional rights under either the federal or state constitution, or both.

The First Amendment to the United States Constitution provides, in pertinent part, as follows:

Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

In *Mills v. Alabama*, 384 *U.S.* 214, 219, 86 *S.Ct.* 1434, 1437, 16 *L.Ed.*2d 484, 488 (1966), the United States Supreme Court noted that the language of the First Amendment "specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars, *see Lovell v. Griffin*, 303 *U.S.* 444 [58 *S.Ct.* 666, 82 *L.Ed.* 949 (1938)], to play an important role in the discussion of public affairs." The First

Amendment has also been interpreted to protect the media's right to gather news. *See Richmond Newspapers, Inc. v. Virginia,* 448 *U.S.* 555, 576, 100 *S.Ct.* 2814, 2827, 65 *L.Ed.*2d 973, 989 (1980); *Branzburg v. Hayes,* 408 *U.S.* 665, 681, 92 *S.Ct.* 2646, 2656, 33 *L.Ed.*2d 626, 639 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated.").

Ramos also relies on two sections of the New Jersey Constitution. They provide:

Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press.

[*N.J. Const.* art. I, ¶ 6.]

The people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances.

[*N.J. Const.* art. I, ¶ 18.]

In *State v. Schmid,* 84 *N.J.* 535, 557, 423 *A.*2d 615 (1980), *appeal dismissed sub nom., Princeton Univ. v. Schmid,* 455 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.*2d 855 (1982), our Supreme Court characterized those provisions as "more sweeping in scope than the language of the First Amendment." The Court also observed "that freedom of the press, intimately associated with individual expressional and associational rights, is strongly protected under the State Constitution." *Id.* at 556, 423 *A.*2d 615 (citations omitted). *See also N.J. Coal. Against War in the Middle E. v. J.M.B. Realty Corp.,* 138 *N.J.* 326, 353, 650 *A.*2d 757 (1994) (the New Jersey Constitution provides free speech guarantees "broader than the right against governmental abridgement of speech found in the First Amendment"), *cert. denied,* 516 *U.S.* 812, 116 *S.Ct.* 62, 133 *L.Ed.*2d 25 (1995).

In *Berkery v. Estate of Stuart,* 412 *N.J.Super.* 76, 88, 988 *A.*2d 1201 (App.Div.2010), a case involving actual malice in the context of a defamation case against an author, we had occasion to consider the parameters of the Supreme Court's reference to "published investigative reports by media and media-related defendants" in *Senna v. Florimont,* 196 *N.J.* 469, 489, 958 *A.*2d 427

(2008).[3]  We observed that "[t]he investigative function an author performs is not substantively different from an investigative journalist." *Berkery, supra,* 412 *N.J.Super.* at 89, 988 *A.*2d 1201. More significantly, we concluded that

[t]he dispositive element is not the form of the investigative process.  In an era marked by a diminution of the classic newsmedia and the print investigative journalist and the proliferation of investigative reporting in media such as cable television, documentary journalism—both televisions and movies—internet reporting and blogging, the need for protection remains the same.
[*Ibid.*]

Consequently, like the "humble leaflets and circulars" in *Mills,* a documentary is a recognized form of journalism, entitled to protection of freedom of the press.

We apply the same reasoning in this case.  A documentary about a subject of public interest, such as urban gangs, is a form of investigative journalism, and the process of preparing such a documentary is a form of news gathering.  For that reason, those activities are protected by the First Amendment to the United States Constitution and by the New Jersey Constitution, most particularly Article I, paragraph 6.

### D.

█  We now address the issue of whether the motion judge correctly determined that Flowers' qualified-immunity defense required dismissal of Ramos's monetary damages.

█  Police officers in Flowers' position may be shielded from liability for civil damages in a civil rights suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 *U.S.* 800, 818, 102 *S.Ct.* 2727, 2738, 73 *L.Ed.*2d 396, 410 (1982); *Orsatti v. N.J. State Police,* 71 *F.*3d 480, 483 (3d

---

[3] In *Senna,* the Court noted that the requirement of actual malice in defamation cases originated in the First Amendment context. *Id.* at 481–82, 958 *A.*2d 427 (citing primarily *New York Times Co. v. Sullivan,* 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964)).

Cir.1995). Police officers are afforded the defense of qualified immunity to serve two competing interests. First, police officers need to be free to discharge "their duties without the fear of constantly defending themselves against insubstantial claims for damages...." *Orsatti, supra,* 71 *F.*3d at 483. Second, the public has a need to vindicate a violation of civil rights through a monetary award. *Ibid.* (citing *Anderson v. Creighton,* 483 *U.S.* 635, 639, 107 *S.Ct.* 3034, 3038–39, 97 *L.Ed.*2d 523, 530 (1987)); *see Pearson v. Callahan,* 555 *U.S.* 223, 231, 129 *S.Ct.* 808, 815, 172 *L.Ed.*2d 565, 573 (2009). This protection exists "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson, supra,* 555 *U.S.* at 231, 129 *S.Ct.* at 815, 172 *L.Ed.*2d at 573 (quoting *Groh v. Ramirez,* 540 *U.S.* 551, 567, 124 *S.Ct.* 1284, 1295, 157 *L.Ed.*2d 1068, 1084 (2004) (KENNEDY, J., dissenting)).

The defense of qualified immunity acknowledges that an officer may make "reasonable mistakes ... as to the legal constraints on particular police conduct." *Saucier v. Katz,* 533 *U.S.* 194, 205, 121 *S.Ct.* 2151, 2158, 150 *L.Ed.*2d 272, 284 (2001), overruled in part by *Pearson, supra,* 555 *U.S.* at 236, 129 *S.Ct.* at 818, 172 *L.Ed.*2d at 576 (concluding that the sequence of analysis set forth in *Saucier* is not mandatory). Thus, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier, supra,* 533 *U.S.* at 202, 121 *S.Ct.* at 2156–57, 150 *L.Ed.*2d at 282.

To determine whether a government official is entitled to the qualified-immunity defense, a court applies either or both of the two prongs of analysis outlined in *Saucier, supra,* 533 *U.S.* at 200–01, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 281, using the flexible approach endorsed in *Pearson, supra,* 555 *U.S.* at 236, 129 *S.Ct.* at 818, 172 *L.Ed.*2d at 576. One prong asks whether "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right[.]"

*Saucier, supra,* 533 *U.S.* at 201, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 281. The other prong asks "whether the right was 'clearly established' at the time of defendant's alleged misconduct." *Pearson, supra,* 555 *U.S.* at 232, 129 *S.Ct.* at 816, 172 *L.Ed.*2d at 573 (quoting *Saucier, supra,* 533 *U.S.* at 201, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 281). In other words, "[q]ualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Ibid.* (citing *Anderson, supra,* 483 *U.S.* at 640, 107 *S.Ct.* at 3039, 97 *L.Ed.*2d at 531).

We have already determined that Ramos's activities in creating a documentary were constitutionally protected under both the federal and state constitutions because they were in the nature of news gathering. We next determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation" that Flowers confronted. *Saucier, supra,* 533 *U.S.* at 202, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 282.

In finding that the right was not clearly established, the motion judge relied primarily on the Third Circuit's opinion in *Kelly.* The plaintiff in that case was a motorist who was stopped for traffic violations and used a handheld video recorder to film the officer who had stopped him. *Kelly, supra,* 622 *F.*3d at 251. Unlike the plaintiff in *Kelly,* who was videotaping a police officer in the middle of his own traffic stop, Ramos was filming gang activity for a documentary when, he alleges, he was stopped by the police and Flowers warned him to desist and threatened him.

In *Kelly,* the Third Circuit determined that "there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment." *Id.* at 262. Nevertheless, the court noted that it had previously hypothesized that "videotaping or photographing the police in the performance of their duties on public property *may* be a protected activity." [*Gilles v. Davis*], 427 *F.*3d [197], 212 n. 14 (3d Cir.2005) (citing *Smith v. City of Cumming,* 212 *F.*3d 1332, 1333 (11th Cir.2000)) (emphasis added). We also noted that "[m]ore generally,

photography or videography that has a communicative or expressive purpose enjoys some First Amendment protection." *Id.* (citations omitted). [*Id.* at 260.]

The court in *Kelly* also referred to *Robinson v. Fetterman,* 378 *F.Supp.*2d 534 (E.D.Pa.2005). *Kelly, supra,* 622 *F.*3d at 260–61. There the district court had held that "[v]ideotaping is a legitimate means of gathering information for public dissemination and can often provide cogent evidence...." [4] *Robinson, supra,* 378 *F.Supp.*2d at 541. The plaintiff in that case had been videotaping state troopers performing truck inspections, which he thought were being done in an unsafe manner. The district court held that "there can be no doubt that the free speech clause of the [United States] Constitution protected" that activity. *Ibid.,* quoted in *Kelly, supra,* 622 *F.*3d at 260.

In *Glik v. Cunniffe,* 655 *F.*3d 78 (1st Cir.2011), the First Circuit upheld the denial of a qualified-immunity defense to police officers who had arrested a § 1983 claimant for filming them with his cell phone. Glik, who was not making a documentary or engaged in journalistic activity, was filming police offers arresting someone on Boston Common because he believed they were using excessive force. *Id.* at 79–80. The court explained the inapplicability of qualified immunity as follows:

It is firmly established that the First Amendment's aegis extends further than the text's proscription on laws "abridging the freedom of speech, or of the press," and encompasses a range of conduct related to the gathering and dissemination of information. As the Supreme Court has observed, "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank v. Bellotti,* 435 *U.S.* 765, 783, 98 *S.Ct.* 1407 [1419], 55 *L.Ed.*2d 707 [722] (1978); *see also Stanley v. Georgia,* 394 *U.S.* 557, 564, 89 *S.Ct.* 1243 [1247], 22 *L.Ed.*2d 542 [549] (1969) ("It is . . . well established that the Constitution protects the right to receive information and ideas."). An important corollary to this interest in protecting the stock of public information is that "[t]here is an undoubted right to gather news 'from any source by means within the

---

[4] Our Supreme Court quoted that language with approval in *Tarus v. Borough of Pine Hill,* 189 *N.J.* 497, 512, 916 *A.*2d 1036 (2007), in which it recognized the right of a member of the public to videotape a borough council's public meetings, subject to reasonable guidelines to avoid disruption of the meeting.

law.'" *Houchins v. KQED, Inc.*, 438 *U.S.* 1, 11, 98 *S.Ct.* 2588 [2594], 57 *L.Ed.*2d 553 [562] (1978) (quoting *Branzburg v. Hayes*, 408 *U.S.* 665, 681–82, 92 *S.Ct.* 2646 [2657], 33 *L.Ed.*2d 626 [639] (1972)).

The filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within these principles. Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting "the free discussion of governmental affairs." *Mills v. Alabama*, 384 *U.S.* 214, 218, 86 *S.Ct.* 1434 [1437], 16 *L.Ed.*2d 484 [488] (1966). Moreover, as the Court has noted, "[f]reedom of expression has particular significance with respect to government because '[i]t is here that the state has a special incentive to repress opposition and often wields a more effective power of suppression.'" *First Nat'l Bank*, 435 *U.S.* at 777 n. 11[, 98 *S.Ct.* at 1416, 55 *L.Ed.*2d at 718] (alteration in original) (quoting Thomas Emerson, *Toward a General Theory of the First Amendment* 9 (1966)). This is particularly true of law enforcement officials, who are granted substantial discretion that may be misused to deprive individuals of their liberties. *Cf. Gentile v. State Bar of Nev.*, 501 *U.S.* 1030, 1035–36, 111 *S.Ct.* 2720 [2724–25], 115 *L.Ed.*2d 888 [898–99] (1991) (observing that "[t]he public has an interest in [the] responsible exercise" of the discretion granted police and prosecutors). Ensuring the public's right to gather information about their officials not only aids in the uncovering of abuses, *see id.* at 1034–35 [111 *S.Ct.* at 2724, 115 *L.Ed.*2d at 898] (recognizing a core First Amendment interest in "the dissemination of information relating to alleged governmental misconduct"), but also may have a salutary effect on the functioning of government more generally, *see Press–Enter. Co. v. Superior Court*, 478 *U.S.* 1, 8, 106 *S.Ct.* 2735 [2740], 92 *L.Ed.*2d 1 [10] (1986) (noting that "many governmental processes operate best under public scrutiny").

In line with these principles, we have previously recognized that the videotaping of public officials is an exercise of First Amendment liberties. In *Iacobucci v. Boulter*, 193 *F.*3d 14 (1st Cir.1999), a local journalist brought a § 1983 claim arising from his arrest in the course of filming officials in the hallway outside a public meeting of a historic district commission. The commissioners had objected to the plaintiff's filming. *Id.* at 18. When the plaintiff refused to desist, a police officer on the scene arrested him for disorderly conduct. *Id.* The charges were later dismissed. *Id.* Although the plaintiff's subsequent § 1983 suit against the arresting police officer was grounded largely in the Fourth Amendment and did not include a First Amendment claim, we explicitly noted, in rejecting the officer's appeal from a denial of qualified immunity, that because the plaintiff's journalistic activities "were peaceful, not performed in derogation of any law, and *done in the exercise of his First Amendment rights,* [the officer] lacked the authority to stop them." *Id.* at 25 (emphasis added).

Our recognition that the First Amendment protects the filming of government officials in public spaces accords with the decisions of numerous circuit and district courts. *See, e.g., Smith v. City of Cumming*, 212 *F.*3d 1332, 1333 (11th Cir.2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Fordyce v. City of Seattle*, 55 *F.*3d 436, 439 (9th Cir.1995) (recognizing a "First Amendment right to film matters of public interest"); *Demarest v. Athol/*

*Orange Cmty. Television, Inc.*, 188 *F.Supp.*2d 82, 94–95 (D.Mass.2002) (finding it "highly probable" that filming of a public official on street outside his home by contributors to public access cable show was protected by the First Amendment, and noting that, "[a]t base, plaintiffs had a constitutionally protected right to record matters of public interest"); *Channel 10, Inc. v. Gunnarson*, 337 *F.Supp.* 634, 638 (D.Minn.1972) (holding that police interference with television newsman's filming of crime scene and seizure of video camera constituted unlawful prior restraint under First Amendment); *cf. Schnell v. City of Chi.*, 407 *F.*2d 1084, 1085 (7th Cir.1969) (reversing dismissal for failure to state a claim of suit claiming police interference with news reporters['] and photographers' "constitutional right to gather and report news, and to photograph news events" under the First Amendment (internal quotation mark omitted)), *overruled on other grounds by City of Kenosha v. Bruno*, 412 *U.S.* 507, 93 *S.Ct.* 2222, 37 *L.Ed.*2d 109 (1973); *Connell v. Town of Hudson*, 733 *F.Supp.* 465, 471–72 (D.N.H.1990) (denying qualified immunity from First Amendment claim to police chief who prevented freelance photographer from taking pictures of car accident).

[*Id.* at 82–83.]

The First Circuit further held that the right was clearly established at the time of Glik's arrest in 2007. *Id.* at 84–85. In doing so, the court distinguished the Third Circuit's opinion in *Kelly*.

*Kelly* is clearly distinguishable on its facts; a traffic stop is worlds apart from an arrest on the Boston Common in the circumstances alleged. Nonetheless, even if these cases were to establish a circuit split with respect to the clarity of the First Amendment's protections in the situation before us, that split would not undermine our conclusion that the right violated by appellants was clearly established in this circuit at the time of Glik's arrest. *See Newman v. Massachusetts*, 884 *F.*2d 19, 25 (1st Cir.1989) (finding constitutional right clearly established in the First Circuit despite "recogni[tion] that the courts are not yet unanimous on whether this ... right exists").

In summary, though not unqualified, a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment. Accordingly, we hold that the district court did not err in denying qualified immunity to the appellants on Glik's First Amendment claim.

[*Id.* at 85.]

Because the creation of a documentary concerning a matter of public interest is a form of news gathering and expressive speech, there was certainly nothing new or novel about Ramos's filming of police activity. News footage of police activity has been a fairly regular feature of television news programs at least since the 1950s or 1960s. Although not dispositive, we note that the police officers, other than Flowers, allowed Ramos to continue to film on

July 2, 2006, once he had moved across the street as they requested. The confrontation with Flowers occurred after Ramos had complied with the other officers' request that Ramos change his location.

Consequently, we conclude that a reasonable police officer in 2006 could not have believed he had the absolute right to preclude Ramos from videotaping any gang activities or any interaction of the police with gang members for the purposes of making a documentary film on that topic. The motion judge erred in holding otherwise.

Of course, Ramos's activity was "subject to reasonable time, place, and manner restrictions." *Id.* at 84 (citation omitted). Such restrictions, however, must be content neutral and " 'narrowly tailored to serve a significant governmental interest' " and " 'leave open ample alternative channels for communication of the information.' " *Ward v. Rock Against Racism,* 491 *U.S.* 781, 791, 109 *S.Ct.* 2746, 2753, 105 *L.Ed.2d* 661, 675 (1989) (quoting *Clark v. Cmty. for Creative Non–Violence,* 468 *U.S.* 288, 293, 104 *S.Ct.* 3065, 3069, 82 *L.Ed.2d* 221, 227 (1984)). The issue of whether Flowers sought to impose reasonable time, place, and manner restrictions with respect to Ramos was not considered in the trial court and is not before us.

We reverse the dismissal of count one of the complaint.

E.

Finally, we turn briefly to Ramos's claims concerning unlawful search and seizure in violation of the Fourth Amendment to the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution.

First, we note that Ramos's claims go beyond the arrest on May 12, 2006, upon which the motion judge relied, and include the July 2, 2006 incident at the barbecue and the July 6, 2006 incident at

the library.[5] The motion judge did not address those matters.

Second, with respect to the May 12, 2006 incident, the motion judge found that Ramos had conceded probable cause by pleading guilty to a single down-graded charge, but cited no law to support his determination. The record does not contain a transcript of the guilty plea nor does it specify the municipal ordinance to which Ramos pled guilty. On this record, we are unable to review the judge's decision as to that incident.

Consequently, we reverse the dismissal of count two and remand for further consideration.

## III.

In summary, we hold that (1) qualified immunity is an affirmative defense under the Civil Rights Act, (2) the defense of qualified immunity applies only to claims for money damages and not to claims for injunctive relief, and (3) the right to engage in news gathering for the purposes of creating a documentary concerning a matter of public interest is protected by the First Amendment and the New Jersey Constitution and that right was clearly established in 2006 for qualified-immunity purposes.

We also conclude that Ramos's unlawful search and seizure claims were broader than those addressed by the motion judge and that the record before us is not sufficient for us to review the dismissal of those claims as they relate to the May 12, 2006 incident.

Consequently, we reverse the order on appeal and remand to the Law Division for further proceedings consistent with this opinion. In doing so, we express no opinion on the merits of Ramos's underlying claims. As noted at the beginning, for the

---

[5] Those incidents were not as clearly raised in the complaint as they were in Ramos's brief in opposition to the motion for summary judgment in the Law Division. However, they were raised before the Law Division, and any pleading issue could be resolved through *Rules* 4:9–1 and –2.

purposes of this opinion, we have viewed the facts in the light most favorable to Ramos.

Reversed and remanded.