NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3730-16T2

T.A., T.C., B.C.,
M.E., J.S., and R.S.,[1]

    Plaintiffs-Appellants,

v.

ERICK MELGAR, JANETTE BENNETT,
EDNA MAHAN CORRECTIONAL FACILITY
FOR WOMEN, and NEW JERSEY DEPARTMENT
OF CORRECTIONS,

    Defendants,

and

WILLIAM HAUCK, JAMES MARAFIOTI,[2]
SCOTT LAMOREAUX,[3] and WILLIAM BROWN,

    Defendants-Respondents.

_____

Submitted May 21, 2018 — Decided  July 19, 2018

Before Judges Ostrer, Rose and Firko.

On appeal from Superior Court of New Jersey,
Law Division, Hunterdon County, Docket No.

_____

[1] We use initials to protect the plaintiffs' privacy interests.

[2] Improperly pled as Chief Mariordi.

[3] Improperly pled as Scott Lamaroux.

L-0466-12.

Walsh Pizzi O'Reilly Falanga, L.L.P., attorneys for appellants (Marc D. Haefner, of counsel and on the briefs; Katelyn O'Reilly, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondents (Melissa H. Raksa, Assistant Attorney General, of counsel; Tasha M. Bradt, Deputy Attorney General, on the brief).

PER CURIAM

This appeal has its genesis in sexual and physical abuse allegations made by various inmates incarcerated in the North Hall of Edna Mahan Correctional Facility for Women ("EMCFW") against their "cage officer," Erick Melgar. Plaintiffs T.A., T.C., B.C., M.E., J.S., and R.S. are six of those inmates. Following an investigation by the Department of Corrections' ("DOC") Special Investigations Division ("SID"), departmental charges against Melgar were substantiated, and he ultimately was terminated from employment.[4]

Plaintiffs appeal from an August 12, 2016 order granting partial summary judgment that dismissed with prejudice their civil

_____

[4] Having settled plaintiffs' civil claims against him, Melgar is not a party to this appeal. Plaintiffs also named as defendants the DOC, EMCFW, and prison personnel. Those defendants either settled their claims with plaintiffs, or were dismissed from the litigation for reasons that are not pertinent to this appeal.

A-3730-16T2

rights claims against Melgar's supervisors, William Hauck, James Marafioti, Scott Lamoreaux, and William Brown (collectively, "supervisory defendants").  Plaintiffs also appeal from a March 13, 2017 order, granting defendants' motion for reconsideration of a January 30, 2013 order[5] entered by another judge, thereby dismissing the tort claims pertaining to T.C., B.C., and R.S.[6] for failure to timely file a notice of claim pursuant to the New Jersey Tort Claims Act ("TCA"), N.J.S.A. 59:1-1 to 12-3.  For the reasons that follow, we reverse the August 12 order granting summary judgment, and affirm the March 13 order dismissing the tort claims.

## I.

## A.

Initially, we consider the August 12 order dismissing plaintiffs' civil rights claims.  In doing so, we discern the pertinent facts from the summary judgment record, extending to plaintiffs all favorable inferences.  R. 4:46; Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995).

---

[5] The January 30 order is not contained in the record on appeal, but is referenced in the March 13 order.  The motion was filed on behalf of all of the State defendants.

[6] The tort claims pertaining to T.A., M.E., and J.S. were dismissed as part of the January 30, 2013 order and, as such, were not part of defendants' motion for reconsideration.

Pertinent to this appeal are the nature and timing of plaintiffs' reports to the supervisory defendants about Melgar's misconduct. In particular, plaintiffs claim the supervisory defendants were deliberately indifferent to their reports, and that their inaction violated their rights pursuant to the New Jersey Civil Rights Act, ("NJCRA"), N.J.S.A. 10:6-1 to -2, and the Federal Civil Rights Act ("FCRA"), 42 U.S.C.A. § 1983. Plaintiffs, thus, challenge the trial court's determination that the supervisory defendants are protected from liability by the qualified immunity doctrine pursuant to Pearson v. Callahan, 555 U.S. 223, 231 (2009) (stating the doctrine of qualified immunity, protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (Citation omitted). Because that determination depends on the substance of plaintiffs' reports and when they were made, we set forth the facts in the following chronology.

According to her deposition testimony, T.A. claimed she first reported Melgar's inappropriate behavior to Lamoreaux in 2007 because she trusted him, having known the sergeant[7] since the 1990s

---

[7] Lamoreaux was identified as a lieutenant in the present action.

when he began working at EMCFW. Lamoreaux referred T.A. to Brown, the shift sergeant. T.A. told Brown that Melgar swatted inmates with rolled up cardboard or paper and wrestled inmates in their cells. Brown told T.A. that Melgar was a "young guy" and needed time to "settle in."

Following a "destructive" search of her cell on February 28, 2008, T.A. wrote a letter to Hauck, the administrator of EMCFW. In that correspondence, T.A. suggested officers retaliated against her for complaining about Melgar's behavior "over the past few months." Her letter contains specific references to Melgar's conduct, including "hitting the various female inmates with rolled up newspaper, 'playing,' or as some would call it, aggravated assault." The letter also details why T.A. did not file a formal complaint against Melgar:

> Because like every other female prisoner, I live in fear of retaliation, I never did write any of that up committing it to paper, but I did speak to a couple [of sergeants] and Captain about it figuring discretion would be used and I wouldn't have to suffer unnecessarily . . . I have also been told repeatedly that since we have no cameras inside the units of this particular prison it would be my word against his, [and] the 'playing' would be impossible to prove.

The February 28 letter is unsigned by T.A. Hauck certified that he never received the letter. Nor was it stamped "received" or initialed by him, thereby "depart[ing] from procedure." Had

5

he received such a letter, he "would have taken immediate action to have [the allegations] investigated."

The next month, officers searched and "destroyed" the prison library where T.A., as librarian, was solely responsible for the week-long cleanup, including re-alphabetizing the books that had been "thrown on the floor." T.A. testified she met with Lamoreaux and Marafioti, the chief, shortly after that search, and told them she believed the search of the library, and the previous search of her cell, were retaliation for her complaints about Melgar.

In response to Marafioti's inquiry regarding the reason for retaliation, T.A. testified, "I complained about the ruler game. He said, ['T]he ruler game, what's the ruler game[?'] Like he didn't know any of this. So that means the complaint I made to Sergeant Brown, he never must have told Chief [Marafioti]." T.A. claimed other ranking officers were present at that meeting when she characterized "the hitting with the ruler and the wrestling . . . [as] sexual in nature[;] . . . . this wasn't just a man playing around."

According to Lamoreaux's deposition testimony, he recalled T.A. and Marafioti speaking after the library incident, but he could not hear the conversation. Marafioti testified he had no recollection of ever having spoken with T.A. or any other inmates about Melgar.

In April 2009, inmate R.L. filed an internal complaint against Melgar. Hauck referred her allegations to SID, which then instituted a formal investigation.[8] R.L. alleged Melgar sexually assaulted her in December 2008. Specifically, "Melgar entered her cell . . . put his hand inside her bra and touched her breast." After a struggle, Melgar attempted to place his hands inside R.L.'s pants. Melgar denied the allegations and because there were no eyewitnesses to the incident, SID concluded there was "no evidence to support the allegations made by [R.L.]."

In June 2010, plaintiff R.S. disclosed to prison psychologist, Nicole DeVita, that while R.S. was in her cell, Melgar attempted to "hug up on her." Further, Melgar "picked up a stick of salami that was in her room and started playing with it." R.S. claimed Melgar "plays hard with the other women, throwing water and everything, but they like it." Dr. DeVita reported R.S.'s allegations to Hauck, who referred the matter to SID.

The following month, SID received written reports from nineteen North Hall inmates, including plaintiffs R.S., T.A., B.C., and T.C., attesting to Melgar's good character. In

_____

[8] Plaintiffs did not receive SID's investigative report regarding R.L.'s complaint during the course of discovery. Instead, the supervisory defendants provided the report with Hauck's reply certification in support of their summary judgment motion.

A-3730-16T2

particular, they described Melgar as "professional, respectful[,] and that he [ran] a good unit." Despite those positive assessments, SID continued its investigation.

SID's interviews of R.S. and T.A. revealed both inmates were pressured into writing positive reports, fearing retaliation from Melgar. R.S. and T.A. separately disclosed Melgar's abuse in greater detail, including that he grabbed R.S.'s breasts, smacked her buttocks, and threw ice on inmates while they showered. SID interviewed more than fifteen other North Hall inmates, who largely corroborated the allegations of abuse reported by R.S. and T.A. Some of the inmates also alleged Melgar engaged in sexual intercourse with them. Melgar was transferred to another facility in July 2010, suspended without pay in August 2010, and terminated thereafter.

### B.

When a party appeals from an order granting summary judgment, our review is de novo and we apply the same standard as the trial court pursuant to Rule 4:46-2. Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007). First, we determine whether the moving party demonstrated there were no genuine disputes as to material facts, and then we decide whether the motion judge's application of the law was correct. Atl. Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J. Super. 224, 230-31

(App. Div. 2006). In doing so, we view the evidence in the light most favorable to the non-moving party. Brill, 142 N.J. at 540. A party may defeat a motion for summary judgment by demonstrating the evidential materials relied upon by the moving party, considered in light of the applicable burden of proof, raise sufficient credibility issues "to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Id. at 523. We review the legal conclusions of the trial court de novo, without any special deference. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

To prevail on a claim brought pursuant to 42 U.S.C.A. § 1983, a plaintiff must first identify "'the person acting under color of law[]' that has caused the alleged deprivation[,]" and then "'identify a "right, privilege or immunity" secured to the claimant by the Constitution or other federal laws of the United States.'" Rezem Family Assocs. L.P. v. Borough of Millstone, 423 N.J. Super. 103, 114 (App. Div. 2011) (quoting Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 363 (1996)). "We see no reason to apply different elements to a cause of action brought under the [NJCRA, N.J.S.A. 10:6-2]," as "[t]he New Jersey statute was modeled after § 1983." Id. at 115; Gormley v. Wood-El, 218 N.J. 72, 98 (2014); See also Tumpson v. Farina, 218 N.J. 450, 474 (2014) (The

NJCRA "is modeled off of the analogous [FCRA]," and thus cases applying "Section 1983 may provide guidance in construing our Civil Rights Act.").

The qualified immunity doctrine "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. The burden rests on a defendant to establish he is entitled to such immunity. See Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989).

To determine whether an official is entitled to qualified immunity, courts apply a two-prong test. Pearson, 555 U.S. at 232 (citation omitted); Ramos v. Flowers, 429 N.J. Super. 13, 27-28 (App. Div. 2012). The first "prong asks whether '[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[.]'" Ramos, 429 N.J. Super. at 28 (alterations in original) (citation omitted). The inquiry under the second prong is "whether the right was 'clearly established' at the time of defendant's alleged misconduct." Ibid. (quoting Pearson, 555 U.S. at 232). "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right.'" <u>Gormley</u>, 218 N.J. at 113 (alteration in original) (citation omitted).

Where, as here, plaintiffs claim an Eighth Amendment violation for a supervisor's inaction relevant to prong one, they must demonstrate "'(1) the deprivation alleged [is] objectively, sufficiently serious;' and (2) the 'prison official [had] a sufficiently culpable state of mind.'" <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 125 (3d Cir. 2001) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)). "In prison conditions cases, 'that state of mind is one of "deliberate indifference" to inmate health or safety.'" <u>Ibid.</u> (quoting <u>Farmer</u>, 511 U.S. at 834). Deliberate indifference is a subjective standard requiring that the prison official "must actually have known or been aware of the excessive risk to inmate safety." <u>Ibid.</u> Thus, "a defendant cannot have qualified immunity if she was deliberately indifferent; a reasonable [prison official] could not believe that her actions comported with clearly established law while also believing that there is an excessive risk to the plaintiffs and failing to adequately respond to that risk." <u>Id.</u> at 142 n.15.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . <u>and a factfinder may conclude that a prison official</u>

knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842 (emphasis added) (citations omitted). "For example, if . . . the circumstances suggest that the [official] being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the [official] had actual knowledge of the risk." Id. at 842-43 (emphasis added).

Here, the trial court invaded the province of the factfinder, improperly weighing the evidence in favor of the non-moving supervisory defendants. Specifically, the trial court concluded plaintiffs' reports describing Melgar's conduct prior to R.S.'s June 2010 sexual contact disclosure, were not "constitutional violation[s]" that "set off any warning signs of serious misconduct or serious risk to the health and safety of the inmates. . . . [C]ertainly [T.A.] was [not] characterizing these types of things as something that was a serious threat to the health and safety of the inmates." The trial court's analysis is unsupported by the record and contravenes the summary judgment standard.

In particular, the trial court erroneously discredited evidence in the record that could support a factfinder's conclusion that the supervisory defendants were aware Melgar posed a

substantial risk to the North Hall inmates prior to R.S.'s June 2010 disclosure. See Farmer, 511 U.S. at 842. For example, the trial court concluded T.A.'s aggravated assault reference in her February 28, 2008 letter was "taken out of context" because most of the letter concerns "complain[ts] about the destruction of her room." However, the letter clearly describes Melgar as "hitting the various female inmates with rolled up newspaper." While the trial court recognized "uninvited inappropriate touching of somebody, whether it be with a ruler or cardboard or wresting, would constitute a simple assault so that would certainly qualify as criminal [conduct]," the court did not consider these acts as constitutional violations that would pose a "serious risk to the health and safety of the inmates." We disagree.

It is well-settled that "the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners . . . and must 'take reasonable measures to guarantee the safety of the inmates.'") Farmer, 511 U.S. at 832 (citation omitted); see also N.J. Const. art. I, ¶ 12. In light of these legal principles, a factfinder could conclude that wrestling with prisoners and striking them with an object, especially where, as here, the guard and inmates are members of the opposite sex, could trigger Eighth Amendment

protections.  As such, summary judgment was inappropriate on that basis.

Moreover, plaintiffs have proffered evidence that four separate reports were made prior to June 2010, suggesting the supervisory defendants "had been exposed to information concerning the risk" to plaintiffs, and "such evidence could be sufficient to permit a trier of fact to find that the [supervisory defendants] had actual knowledge of the risk."  Farmer, 511 U.S. at 842. Because Hauck denied he received T.A.'s letter; Marafioti and Lamoreaux denied T.A. reported Melgar's misconduct to them; and Brown downplayed Melgar's conduct in his response to T.A., plaintiffs' sworn statements and deposition testimony to the contrary create genuinely disputed issues of material fact.  See, e.g., Shanley & Fischer, P.C. v. Sisselman, 215 N.J. Super. 200, 211-12 (App. Div. 1987) (stating the trial court should not decide summary judgment motions based on dueling affidavits inasmuch as there are material facts at issue, including but not limited to the subjective elements of intent and credibility determinations, which must be decided by the trier of fact).

In sum, genuine disputes as to material facts exist with respect to the timing and nature of plaintiffs' reports to the supervisory defendants regarding Melgar's misconduct.  Many of these disputed facts require credibility determinations by a fact-

finder. <u>Brill</u>, 142 N.J. at 523. If, as plaintiffs assert, they reported misconduct that violates the Eighth Amendment to the supervisory defendants prior to June 2010, then the doctrine of qualified immunity would not extend to those defendants. Accordingly, we reverse the order granting summary judgment to the supervisory defendants.

## II.

## A.

We next consider the appeal of plaintiffs T.C., B.C., and R.S. from the trial court's order dismissing their tort claims for lack of proper notice. In setting forth the facts and procedural history from the record pertaining to that motion, plaintiffs are not entitled to the same benefit of favorable inferences as their civil rights claims. <u>Cf.</u> <u>R.</u> 4:46.

In May 2011, T.C., B.C., R.S., and another inmate[9] attempted to file a class action lawsuit, asserting various claims including, violations of the TCA. Those plaintiffs also sought permission to file a late notice of tort claim pursuant to N.J.S.A. 59:8-8. Because the complaint was not signed by an attorney, it was deemed deficient pursuant to <u>Rule</u> 1:21-1. Accordingly, the Hunterdon County Clerk stamped the submission "received" but not "filed."

---

[9] The fourth plaintiff, F.D., is not a party to this appeal.

B.C. claims she resubmitted the complaint in June 2011. Apparently, the clerk's office did not receive the refiled complaint and requested resubmission. In September 2011, B.C. again attempted to file the complaint, but did not receive confirmation from the clerk's office that it was filed. In July 2012, plaintiffs filed a motion seeking leave to file their TCA notice of claim as within time. Three months later, they filed their first amended complaint.

In November 2012, the first motion judge denied plaintiffs' motion as to T.A., M.E., and J.S., dismissing their tort claims. Following a hearing, the judge granted plaintiffs' motion as to the claims filed by T.C., B.C., and R.S. As such, the judge determined "there [was] some kind of service at the very end of May 2011" as to those plaintiffs.

In March 2013, a second amended complaint was filed, by counsel, on behalf of the present plaintiffs. Defendants filed a motion for reconsideration of the first motion judge's order, which was granted by the second motion judge. This appeal followed.

On appeal, plaintiffs contend their motion to deem their notice of tort claim timely was filed within one year of accrual of their claim. They argue the first motion judge correctly determined their May 2011 complaint and motion should be deemed,

"filed" in addition to "received," thereby satisfying the one-year deadline. We disagree.

B.

A trial court's order on a motion for reconsideration will not be set aside unless shown to be a mistaken exercise of discretion. Granata v. Broderick, 446 N.J. Super. 449, 468 (App. Div. 2016) (citing Fusco v. Bd. of Educ., 349 N.J. Super. 455, 462 (App. Div. 2002)). Reconsideration should only be granted in those cases in which the court had based its decision "upon a palpably incorrect or irrational basis," or did not "consider, or failed to appreciate the significance of probative, competent evidence." Ibid. (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)).

The TCA requires a notice of claim against a public entity to be filed within ninety days after the accrual of a cause of action. N.J.S.A. 59:8-8. Generally, a claimant does not timely file a notice of claim, the claim is "forever barred." N.J.S.A. 59:8-8; see also J.P. v. Smith, 444 N.J. Super. 507, 529 (App. Div. 2016) (finding failure to timely file a notice of tort claim "constitutes an absolute bar to recovery").

A notice of claim may be filed beyond the ninety-day time period if leave is obtained from the Superior Court "within one year after the accrual of [the] claim provided that the public

entity . . . has not been substantially prejudiced thereby." N.J.S.A. 59:8-9. The motion must be "supported by affidavits based upon personal knowledge of the affiant showing sufficient reasons constituting extraordinary circumstances for [the] failure to file [a timely] notice of claim." N.J.S.A. 59:8-9; D.D. v. Univ. of Med. and Dentistry of N.J., 213 N.J. 130, 147 (2013). "After the one-year limitation has passed, 'the court is without authority to relieve a plaintiff from his [or her] failure to have filed a notice of claim, and a consequent action at law must fail.'" Pilonero v. Twp. of Old Bridge, 236 N.J. Super. 529, 532-33 (App. Div. 1989) (quoting Speer v. Armstrong, 168 N.J. Super. 251, 255-56 (App. Div. 1979)).

Here, it is undisputed that plaintiffs' cause of action accrued no later than June 24, 2010, i.e., Melgar's last day at EMCFW prior to his transfer to another facility. Although plaintiffs attempted to file their complaint and notice of claim within time, their submission was procedurally defective and properly rejected by the clerk's office. Thus, plaintiffs' submission was received, but it was not filed. Instead, the notice of claim was not filed until July 23, 2012, more than two years after the accrual of plaintiffs' claim.

Relying on Fuller v. Rutgers, State University, 154 N.J. Super. 420, 423 (App. Div. 1977), the second motion judge, aptly

determined, if the motion to file a late notice of claim is not "timely filed within one-year, the trial court . . . does [not] have jurisdiction [to exercise discretion]." Accordingly, plaintiffs failed to satisfy the strict mandates of N.J.S.A. 59:8-9.

Having fully considered plaintiffs' claims in light of the applicable law, we are satisfied the trial judge did not abuse his discretion in granting defendants' motion for reconsideration. As such, the tort claims filed by T.C., B.C., and R.S. were properly dismissed.

Affirmed in part; reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3730-16T2